[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 70 
The defendant's position is, that the covenant for the payment of the rent is, in law, personal between the grantor and grantee, or what is sometimes called in the books a covenant in gross, and, consequently, that after the death of the original parties, no action to recover rent can be maintained in favor of or against any persons except their respective executors or administrators. As the law contemplates that the estates of deceased persons shall be speedily settled, and in the natural course of things the personal representatives of a man disappear with the generation to which they belong, the intention of the parties to the indenture to create a perpetual rent issuing out of the premises will, if that position can be maintained, be entirely disappointed; and the argument is, in effect, that the law does not permit arrangements by which *Page 71 
a rent shall be reserved upon a conveyance in fee, and that where it is attempted the reservation does not affect the title to the land, but the conveyance is absolute and unconditional. The design of the parties to create relations which should survive them, and continue to exist in perpetuity by being annexed to the ownership of the estate of the grantee of the land on the one hand, and of the rent on the other, is manifest from the language of the instrument. They were careful to declare that the obligation to pay the rent should attach to those who should succeed the grantee as his heirs and assigns, and should run in favor of the heirs and assigns of the grantor; and the nature of a perpetually recurring payment requires that there should be an endless succession of parties to receive and to pay it. We have a legislative declaration, in an act of 1805, passed about ten years after this conveyance, that grants in fee reserving rents had then long been in use in this State (ch. 98); and the design of the Legislature by that enactment was, not only to render such grants thereafter available according to their intention, but to resolve, in favor of such transactions, the doubts which it is recited had been entertained respecting their validity. Still, if, by a stubborn principle of law, a burden in the form of an annual payment cannot be attached to the ownership of land held in fee simple, or if the right to enforce such payment cannot be made transferable by the party in whom it is vested, effect must be given to the rule, though it may have been unknown to the parties and to the Legislature; unless indeed the interposition of the latter, by the statute which has been mentioned, can lawfully operate retrospectively upon the conveyance under consideration. It is not denied but that, by the early common law of England, conveyances in all respects like the present would have created the precise rights and obligations claimed by the plaintiff; but it is insisted that the act respecting tenures, called the statute of quia emptores,
enacted in the eighteenth year of King Edward I, and which has been adopted in this country, rendered such transactions no longer possible. The principles of that statute have, in my opinion, always been the law of this *Page 72 
country, as well during its colonial condition as after it became an independent State. A little attention to the preëxisting state of the law will show that this must necessarily have been so. In the early vigor of the feudal system, a tenant in fee could not alienate the feud without the consent of his immediate superior; but this extreme rigor was soon afterwards relaxed, and it was also avoided by the practice of subinfeudation, which consisted in the tenant enfeoffing another to hold of himself by fealty and such services as might be reserved by the act of feoffment. Thus a new tenure was created upon every alienation; and thence there arose a series of lords of the same lands, the first, called the chief lords, holding immediately of the sovereign: the next grade holding of them; and so on, each alienation creating another lord and another tenant. This practice was considered detrimental to the great lords, as it deprived them, to a certain extent, of the fruits of the tenure, such as escheats, marriages, wardships, and the like, which, when due from the terre-tenants, accrued to the next immediate superior. This was attempted to be remedied by the 32d chapter of the Great Charter of Henry III (A.D. 1225), which declared that no freeman should thenceforth give or sell any more of his land, but so that of the residue of the lands the lord of the fee might have the service due to him which belonged to the fee. (1Ruffhead's Statutes at Large, 8.) The next important change was the statute of quia emptores, enacted in 1290, which, after reciting that "forasmuch as purchasers of lands and tenements (quia emptores terrarum et tenementorum,), of the fees of great men and other lords had many times entered into their fees to the prejudice of the lords," to be holden of the feoffors and not of the chief lords, by means of which these chief lords many times lost their escheats, c., "which thing seemed very hard and extreme unto these lords and other great men," c., enacted that from henceforth it should be lawful for every freeman to sell at his own pleasure his lands and tenements, or part of them, so that the feoffee should hold the same lands and tenements of the chief lord of the same fee by such services and customs as his feoffor held *Page 73 
before. (Id., 122.) The effect of this important enactment was, that thenceforth no new tenure of lands which had already been granted by the sovereign could be created. Every subsequent alienation placed the feoffee in the same feudal relation which his feoffor before occupied; that is, he held of the same superior lord by the same services, and not of his feoffor. The system of tenures then existing was left untouched, but the progress of expansion under the practice of subinfeudation was arrested. Our ancestors, in emigrating to this country, brought with them such parts of the common law and such of the English statutes as were of a general nature and applicable to their situation (1 Kent, 473, and cases cited in note a to the 5thed.; Bogardus v. Trinity Church, 4 Paige, 178); and when the first Constitution of this State came to be framed, all such parts of the common law of England and of Great Britain and of the acts of the Colonial Legislature as together formed the law of the Colony at the breaking out of the Revolution, were declared to be the law of this State, subject, of course, to alteration by the Legislature. (Art. 35.) The law as to holding lands and of transmitting the title thereto from one subject to another must have been a matter of the first importance in our colonial state; and there can be no doubt but that the great body of the English law upon that subject, so far as it regarded the transactions of private individuals, immediately became the law of the Colony, subject to such changes as were introduced by colonial legislation. The lands were holden under grants from the Crown, and as the King was not within the statute quiaemptores, a certain tenure, which, after the act of 12 CharlesII (ch. 24) abolishing military tenures, must have been that of free and common socage, was created as between the King and his grantee. I have elsewhere expressed the opinion that the King might, notwithstanding the statute against subinfeudation, grant to his immediate tenant the right to alien his land to be holden of himself, and thus create a manor, where the land was not in tenure prior to the 18th Edward I. (The People v. VanRensselaer, 5 Seld., 334.) But with the exception of the tenure arising upon royal grants, *Page 74 
and such as might be created by the King's immediate grantees under express license from the Crown, I am of opinion that the law forbidding the creating of new tenants by means of subinfeudation was always the law of the Colony, and that it was the law of this State, as well before as after the passage of our act concerning tenures, in 1787. A contrary theory would lead to the most absurd conclusions. We should have to hold that the feudal system, during the whole colonial period, and for the first ten years of the State government, existed here in a condition of vigor which had been unknown in England for more than three centuries before the first settlement of this country. We should be obliged to resolve questions arising upon early conveyances, under which many titles are still held, by the law which prevailed in England during the first two centuries after the Conquest, before the commencement of the Year Books, and long before Littleton wrote his Treatise upon Tenures.
The fact that the statute we are considering was reënacted in this State in 1787, has no tendency to show that it had not the force of law prior to that time. Indeed, the contrary inference is nearly irresistible, when it is seen how it came to be reënacted. The compilation of statutes prepared by Jones and Varick, and enacted by the Legislature, embracing the statute of tenures and a great number of other English statutes, was made in pursuance of an act passed in 1786. It recited the constitutional provision which I have mentioned, and that such of the said statutes "as had been generally supposed to extend to the late Colony and to this State," were contained in a great number of volumes, and were conceived in a style and language improper to appear in the statute books of this State. The persons mentioned were, therefore, authorized to collect and reduce them into proper form, in order that such of them as were approved might be enacted into laws of this State, to the intent that thereafter none of the statutes of England or Great Britain should be in force here. (1 Jones Var., ch. 35, 281.) The statute of tenures was not, therefore, understood as introducing a new law, but was the putting into a more *Page 75 
suitable form certain enactments which it was conceived had the force of law in the Colony, and which the Constitution had made a part of the law of the State. My views upon this question correspond with those expressed by Mr. Justice PLATT, in 18Johnson, 186. The English crown lawyers appear never to have doubted but that the statute was the law of the Colonies. Sir John Somers, Attorney-General, and afterwards Lord Keeper of the Great Seal in the reign of William III, and who is pronounced by Macaulay to have been, in some respects, the greatest man of his age, together with the Solicitor-General, Trevor, gave a written opinion to the King in council, that all the lands in Virginia were held immediately of the Crown, and that the escheats and tenure accrued to him and not to the grantors of the lands. The like opinion was given by Sir Edward Northey, Attorney-General to Queen Anne, in 1705, in respect to lands in New Jersey. He said that the grantees of the proprietors to whom the Duke of York had assigned his patent, held of the Queen and not of these proprietors: and in another opinion, by the same law officer, respecting quit-rents in the Colony of New York, he states that no tenure arose upon grants by the Duke of York before he came to the Crown, he being a subject; but that where the grant was by the Crown there was a tenure, "the Crown not being within the statute of quia emptores terrarum." (Chalmer's ColonialOpinions, 142, 144, 149.)
These opinions assume that the statute prevailed here to the same extent as in England, and subject to the same exception in favor of royal grants, upon which a tenure always arises. Judge RUGGLES, in giving the opinion of the court in De Peyster v.Michael (2 Seld., 467), was led to doubt whether the statute was ever in force in the Colonies, from finding that several patents, issued by the colonial governors, purported to create manors and to authorize the patentees to grant lands to be holden of the patentees. But if the King could, notwithstanding the statute, license his immediate tenants to create seigniories, as was attempted to be shown by one of the opinions in The People
v. Van Rensselaer, and as I am satisfied is the case, these instruments *Page 76 
are quite consistent with the idea that the statute was in force in the Colony of New York. Assuming this to have been so, our own law, in the particular under consideration, is and has at all times, since the organization of political society here, been the same as the law of England.
We are then to ascertain the effect of a conveyance in fee reserving rent, upon the assumption that the statute of quiaemptores applies to such transactions. In the first place, no reversion, in the sense of the law of tenures, is created in favor of the grantor; and as the right to distrain is incident to the reversion, and without one it cannot exist of common right, the relation created by this conveyance did not itself authorize a distress. The fiction of fealty did not exist. The rent in terms reserved was not a rent-service. (Litt., §§ 214, 215.) It was, however, a valid rent-charge. According to the language of LITTLETON, "if a man, by deed indented at this day, maketh a feoffment in fee, and by the same indenture reserveth to him and to his heirs a certain rent, and that if the rent be behind it shall be lawful for him and his heirs to distrain, c., such a rent is a rent-charge, because such lands or tenements are charged with such distress by force of the writing only, and not of common right." (Id., §§ 217, 218.) And the law is the same where the conveyance is by deed of bargain and sale under the statute of uses. (Co. Litt., 143, b.) Mr. HARGRAVE, in his note to this part of the Commentaries, expresses the opinion that a proper fee farm rent cannot be reserved upon a conveyance in fee, since the statute of quia emptores; but he concedes that where a conveyance in fee contains a power to distrain and to reënter, the rent would be good as a rent-charge. (Note 235to Co. Litt., 143, b.) BLACKSTONE says that upon such a conveyance the land is liable to distress, not of common right, but by virtue of the clause in the deed. (2 Bl. Com., 42.) The case of Pluck v. Digges (2 Dow Clark's Parl. Rep.,
180), much relied on by the defendant, concedes that rent reserved upon a conveyance of the grantor's whole estate may be distrained for by virtue of a clause of distress. That case turned wholly upon a question of *Page 77 
pleading. The House of Lords held that the Irish statute, corresponding to the 11 George II (ch. 19, § 22), allowing a general avowry, did not extend to a rent-charge, but was limited to cases of rent-service, and that the defendant ought in that case to have set out his title. It was for this reason that the judgment in his favor was reversed. Lord WYNFORD said, "it is a dreadful thing to be obliged, for a defect in form, to give a judgment contrary to the real merits of the case."
These authorities establish the position that upon the conveyance under consideration a valid rent was reserved, available to the grantor by means of the clause of distress. This rent, though not strictly an estate in the land (Payn v.Beal, 4 Denio, 405), is nevertheless a hereditament, and in the absence of a valid alienation by the person in whose favor it is reserved, it descends to his heirs. Its nature, in respect to the law of descents, is explained by Lord COKE, who at the same time points out the distinction between such a rent as we are considering, and a rent-service reserved upon a feoffment which created a tenure. He says that if a man seised of a manor, as heir on the part of his mother, before the statute of quiaemptores, had made a feoffment in fee of parcel, to hold of him by rent and service, albeit they [the services] are newly created, yet for that they are parcel of the manor, they shall, with the rest of the manor, descend to the heir on the part of the mother. If a man so seised, that is by inheritance from his mother, maketh [now] a feoffment in fee, reserving a rent to him and his heirs, this rent shall go to the heirs on the part of the father. (Co. Litt., 12, b.) The reason is given in a case inHobart, thus: "If, upon a feoffment of lands which I have on the part of the mother, or in Borough English [where the youngest son is the heir] I reserve a rent to me and to my heirs, it shall go to my heirs at common law, for it is not within the custom,but it is a new thing divided from the land itself." (Coundenv. Clerke, 31, b.) The distinction is this: A rent-service, such as arose upon an alienation of a fee at common law, was incident to the reversion, and therefore a part of the estate remaining in the feoffor; *Page 78 
and upon his death it passed in the same channel of descent as the estate would have done if there had been no alienation. But where there is no reversion, as in the case of a conveyance in fee since the statute, the rent reserved is an inheritable estate newly created, and descends according to the general law of inheritance, to the heirs of the person dying seised, without regard to the heritable quality of the estate, the conveyance of which formed the consideration of the rent. Preston states the principle thus: "A rent incident to the reversion will descend with the reversion as a part thereof; but a rent reserved on a grant in fee, or limited by way of use in a conveyance to uses, will be descendible as a new purchase from the person to whom it is reserved or limited." (3 Essay on Abstracts of Title, 54.) Further on he says that in such cases "the instrument amounts to, 1st. A grant of the land from the owner of the same; and, 2dly. A grant of the rent on the part of the grantee." (Id., 55.) To the same purpose see 3 Cruise, 313 (N.Y. ed. of 1834). The descendible quality of these rents was early established in this State in the case of The Executors of Van Rensselaer v. TheExecutors of Platner, decided in the year 1800. The action was for nine years' rent to May 1, 1783, reserved upon a grant in fee by the plaintiffs' testator to the testator of the defendants, executed in 1774; and it appeared that the testator of the plaintiffs died on the 22d of February, 1783, seven days before the last year's rent sued for became payable. The plaintiffs, however, recovered the rent for the whole period; and the defendants moved in arrest of judgment, on the ground that the recovery embraced one year's rent which did not belong to them as executors; and the judgment was arrested for that reason. KENT, J., said, it was clear that the executor could only go for rent due and payable at the testator's death, "where the rent, as in the present case, goes, on the testator's death, to his heirs." (2 John. Ca., 17.) There can be no pretence that the court considered the rent to be a rent-service, on the notion that the statute of quia emptores had not been enacted in this State when the deed was executed; for in the next case in the book, which *Page 79 
was an action for subsequent rent on the same conveyance, and was decided at the same time, it was expressly declared to be "a fee farm rent, or rent-charge." If the annual payments provided for in these conveyances were merely sums in gross secured by personal covenants, the action would have been rightly brought by the executors for the last year's rent, though it fell due after the testator's death. The contract, upon that theory, would have been of the same character as a bond for the payment of moneys by annual installments in perpetuity, in which case, if we can conceive of such a security, the personal representatives of the obligees would have been the proper parties to bring the action, whether the payments sought to be recovered matured before or after the testator's death. It was only upon the assumption that the right to the rent reserved was a heritable estate, which, so far as it had not become payable at his death, descended to the heirs of the grantor, that the judgment can be sustained. The case was argued by eminent counsel — the late Ambrose Spencer and James Emmot — and appears to have received full consideration; three of the judges delivering opinions. It may therefore be considered an authoritative precedent for the doctrine that rents of the character of these we are considering are heritable estates, descending to the heirs of those in whose favor they are reserved.
But the plaintiff in this case sues as devisee of the grantor, and must establish the position that he is entitled, in that character, to sue upon the covenant. In England, it is perhaps a debatable question at this day, whether the assignee of the grantor can maintain the action. In Brewster v. Kidgill (12Mod., 166), HOLT, Ch. J., said he made no doubt but that the assignee of the rent should have covenant against the grantor, "because," he said, "it is a covenant annexed to the thing granted." It was the case of a rent-charge in fee, granted by the owner of the lands out of which it issued, with a covenant to pay it. In Milnes v. Branch (5 Maule Sel., 411), Lord ELLENBOROUGH, Ch. J., stated that he was inclined to think that the language of Lord HOLT, in this respect, was extra-judicial; *Page 80 
and putting aside that dictum, he said he did not find any authority to warrant the position that such a covenant ran with the rent. There are several other English cases bearing more or less directly upon the question, which it is unnecessary particularly to notice, since they have all been examined by Sir Edward Sugden, in a late edition of his Treatise on the Law ofVendors and Purchasers. His conclusion is, that there appears to be no foundation for shaking Lord HOLT'S opinion. The rent-charge, he says, is an incorporeal hereditament, and issues out of the land, and the land is bound by it. The covenant, therefore, he adds, may well run with the rent in the hands of an assignee; the nature of the subject, which savors of the realty, altogether distinguishes the case from a matter merely personal. (Vol. 2, p. 482, W. Brookfield ed. of 1843.) The great learning of the author — afterwards, as Lord St. Leonards, Lord Chancellor of England — would incline me to adopt his conclusion, were it not that we have a precedent the other way in this State. In The Devisees of Van Rensselaer v. The Executors of Platner
(2 John. Ca., 26), to which I have already briefly alluded, the plaintiffs made title to the rent under the will of the grantor of the land, and the defendants were the executors of the grantee, the grantor of the rent-charge. It was held — LANSING, Ch. J., giving the opinion — that the action could not be sustained. The statute 32 Henry VIII, chapter 34, which had been reënacted in this State, it was said did not apply, as it was limited, as appeared by the preamble, to cases of grants for life or years, where there was a reversion; and, moreover, by the common law, such covenants did not pass to the assignee of the covenantee. It was intimated that the difficulty might not have existed if the action had been against the owner of the land charged with the rent, as the assignee of the original grantee, instead of his executors; for, as it was suggested, the common ligament — the estate charged — would have united them in interest as privies. But I do not see that this would have helped the plaintiffs. The defendants, as executors of Platner, the covenantor, were liable to an action upon his express covenant, *Page 81 
at the suit of any one entitled to prosecute upon it, and if the plaintiffs, the devisees, were entitled to avail themselves of the covenant they could do so, as it seems to me, against any party chargeable upon it, whether the covenantor himself, his personal representatives, or those who represented him as privies. The question was not whether the defendants were liable to be sued on the express covenant, for they clearly were, whether it ran with the land or not. But the doubt was whether the plaintiffs so represented the original covenantee as to be able to sue on the contract made to him; and this depended on the question whether the covenant ran with the rent; and it was held that it did not. It was probably in consequence of this decision that the act of 1805 was passed; and assuming that this case was correctly decided, the present question must turn upon the effect of that statute. It seems to have been considered that at common law the assignee of a reversion expectant upon an estate for life or years could not maintain an action upon the covenants of his lessee, though such covenants ran with his estate. It is so expressly recited in the preamble to the statute 32 Henry VIII,
already mentioned, though it was not universally true. (Vyvyan
v. Arthur, 1 Barn. Cress., 410; 2 Sugd., 468.) During the reign of that sovereign the charters and estates of the monasteries, chantries and other religious houses were, by the coercion of the government, surrendered to the King, or came to his hands by force of the statutes made for the suppression of these establishments; and the lands were, for the most part, granted by him to individual subjects. The estates being out on terms for life or years, there was, upon the assumption of the preamble, no person in existence by whom an action could be maintained on the covenants in the lease. After the recital of this matter, the statute proceeds to give an action upon the covenants, not only to the patentees of the King of the estates of the religious houses and their heirs and assigns, but to all others being grantees or assignees of "any other person or persons than the King's highness," and their heirs and assigns. A second section gave the like remedies by the grantees and their assigns *Page 82 
against the assignees of the grantors. (2 Stat. at Large, 294.) Although the statute was made to meet a special occasion, which mainly interested the purchasers of the confiscated property of the Church, the language which extended its operation to other grantees of reversions, introduced a valuable amendment into the law of property. When the commissioners under our act of 1786 came to report as to the English statutes suitable to be reënacted, the act respecting the grantees of reversions was selected for that purpose, and was reënacted in 1788, with certain changes of language — dropping out the reference to the religious houses, and substituting The People of this State for The Crown of England — but retaining the words which adapted it to the case of the grantees of private persons. (2 Jones Var., 184.) It stood in this form when the conveyance to Dietz was executed in 1796, and had not then, as I conceive, any operation upon covenants in conveyances in fee. The opinion of Sir Edward Sugden, that such covenants as last mentioned ran with the rent, was not based upon the 32 Henry VIII, which was admitted to be inapplicable, but upon what was considered the true theory and legal effect of such covenants.
But while Van Rensselaer, the grantor in the indenture under consideration, remained the owner of the rents reserved, and no assignee of those rents had intervened, the act of 1805 was enacted, by which it was declared that all the provisions of the act concerning grantees of reversions, passed in 1788, and the remedies thereby given, should be construed to extend as well to leases in fee reserving rents as to leases for life or years. (Ch. 98.) In the subsequent revision of the statutes, this amendment has been added as an additional section to the substance of the act of 1788. (1 R.L., 364, § 3; 1 R.S., 748, § 25.) As the Revised Statutes of 1830 contained the enactment in force when this grantor died, it will be useful to give the precise language of the 23d section of the title referred to. It is as follows: "The grantees of any demised lands, tenements,rents or other hereditaments, or of the reversion thereof, the assignees of the lessor of any demise, and the heirs and *Page 83 
personal representatives of the lessor, grantee or assignee, shall have the same remedies by entry, action, distress or otherwise, for the non-performance of any agreement contained in the lease so assigned, or for the recovery of any rent, or for the doing of any waste or other cause of forfeiture as their grantor or lessor had, or might have had if such reversion had remained in such lessor or grantor." (1 R.S., 747.) This provision is, as I have stated, by force of the 25th section, to extend as well to grants or leases in fee reserving rents as to leases for life or for years. Thus it appears that the grantees of demised lands, and the grantees of rents, and the grantees of the reversion of demised lands, are to have the same remedies which the grantors or lessors would have been entitled to if no change in their title had taken place, and that grants in fee with a reservation of rent are to be considered as within the provision. Reading the language in connection, the enactment in terms is, that the grantee of rents reserved upon grants in fee shall have the same remedy which his grantor had. Applying the statute to this case, the provision is that the plaintiff shall be entitled to the same remedy which Stephen Van Rensselaer, the Patroon, would have had if he were alive and were now suing. It is added — "if such reversion had remained in such grantor;" and it is argued that as Mr. Van Rensselaer never had a reversion the provision does not apply. But it applies in express terms to reservations of rents upon conveyances in fee, and in such cases I concede that there can be no reversion; and it applies equally to rents upon leases, for life and for years, where there is a proper reversion. Now, the qualification which alludes to the reversion may well be taken distributively and be confined to the cases within the provision where a reversion existed, reddendosingula singulis. It should be applied, in furtherance of the intention, to the subject matter to which it appears by the context most properly to relate. (2 Dwar. on Stat., 617.) But independently of this answer, the Legislature had the right to consider the interest of a grantor in fee reserving rent, as a reversion pro hac vice, if it thought proper to do so; though by the general *Page 84 
rules of law it would not be called by that name. The intent to embrace within the purview of the enactment a rent reserved upon a grant in fee is plain and certain; and effect must be given to that intent, though some of the language should seem to be incongruous.
Two positions were taken at the bar to avoid the effect of this statute upon the case. In the first place, it was assumed that before the passage of our statute of tenures, a reversion did arise upon a grant of lands in fee, and that the act of 1805 should be understood as limited to conveyances executed prior to 1787, and as having, therefore, no effect upon the present case. It was in part to furnish an answer to that suggestion that I have taken pains to show that there was never a period in this State when conveyances between individuals created a tenure, except in the special cases of a grant from the Crown of a power to erect a manor. But without reference to that principle, I am unable to find anything in the statute which countenances the distinction contended for. The act of 1805, which first brought grants in fee reserving rents within the remedies of the 32Henry VIII, chapter 34, recited, as the motive for the enactment, that such grants had long been in use in this State. The argument supposes that it was intended to give effect to such only as had been executed in colonial times and during the first eleven years of the State government. If such were the intention, it is inconceivable that some idea of the kind was not expressed. The language used certainly conveys the understanding that such transactions had been in use up to the time when the Legislature was speaking. I am of opinion that the Legislature considered such conveyances lawful contracts, and intended to render them effectual in the hands of those to whom they should be transferred equally as when they belonged to the original parties to whom the rents were reserved, without regard to the time when the grants were made.
The other answer given to the statute is, that these grants in fee were within the protection of the provision of the Constitution of the United States which forbids the State governments *Page 85 
to pass any law impairing the obligation of contracts. But this statute has no such effect. The parties bound to pay these rents were liable, independently of the statute, to an action at the suit of the grantor of the conveyances and of his heirs in perpetuity. Upon the failure of heirs, the State would take them as an escheat. If it be admitted that they were not assignable before the statute, so as to give the assignee an action in his own name, they were, like other choses in action arising upon contract, assignable in equity; and if the statute had not been passed, the assignee could have prosecuted in the name of the grantor or his heirs for the benefit of the equitable owner. In making them assignable at law and giving the assignee an action in his own name, the Legislature acted only upon the remedy, which all the cases agree it was competent for it to do. The same thing in effect was done by the Code of Procedure in abolishing the distinction between legal and equitable remedies, and requiring all actions to be brought in the name of the real party in interest. (§§ 69, 111.)
There are several precedents of actions of covenant to recover rents of the kind in question, by parties claiming by devise or assignment from the party in whose favor the rent was reserved.Watts v. Coffin (11 John., 495, A.D. 1814), was an action for rent reserved upon a conveyance of land in fee, brought by the assignee of the grantor by virtue of several mesne conveyances, against the assignee of the grantee, and a verdict, subject to the opinion of the court, was sustained. VanRensselaer v. Bradley (3 Denio, 135, A.D. 1846), was a like action for rent on the covenants in a similar conveyance by the devisee of the grantor, against an assignee of the grantee; and the plaintiff prevailed. Van Rensselaer v. Jones (5Denio, 449, A.D. 1848), was another case of precisely the same character, where the plaintiff had judgment.
Ejectment is a remedy given by statute for the recovery of rent. (Stat. 4 Geo. II, ch. 28, § 2; 2 Jones Var., Laws ofN Y, 238, § 23; 1 K. R., 134, § 23; 1 R.L., 1813, 440, § 23, 2 R.S., 505, § 30.) The statutes prescribe that it may be brought in cases between landlord and tenant, where there is *Page 86 
rent in arrear for which no distress can be found, and the landlord has a subsisting right to reënter. When we consider that, at common law, conditions subsequent could only be reserved for the benefit of the grantor and his heirs, and that a stranger could not take advantage of a breach of them (4 Kent's Com.,
127; Litt., § 347 and Coke's Com. thereon; Nicholl v TheN Y and Erie R.R. Co., 2 Kern., 121), and that the only change which this principle has undergone was that wrought by the act of 1805 and its subsequent reënactment, the cases in which the devisee or grantee of one who has conveyed in fee, reserving rent with a clause of reëntry, has sustained ejectment for non-payment of that rent, are in point to show the construction which has been given to that act upon the point under consideration. Such cases have frequently occurred in this State, and many have been reported. In the following cases the action was prosecuted by the devisee or grantee of the original grantor. It could only be sustained by virtue of the statute, and yet no objection to the plaintiff's title was made. In two of the cases the plaintiff prevailed, and in the others he was defeated upon grounds not material here. (Jackson v. Collins, 11 John.,
1, A.D. 1814; Van Rensselaer v. Jewett, 5 Denio, 121;The same v. Hayes, id., 477; The same v. Snyder, in theCourt of Appeals, 3 Kern., 299.)
We have come to the conclusion that the covenant of Dietz was one upon which the plaintiff, as the devisee of Van Rensselaer, has a right to sue any one upon whom that covenant was binding. We do not determine whether this would or would not have been so at the common law, but we place the decision upon the effect of the act of 1805, which, in our opinion, precisely meets the case.
The remaining question is, whether the present defendant is liable on that covenant; and here again there has been some controversy in the English courts. In the case of Brewster v.Kidgill, before referred to, Lord HOLT is supposed to have expressed the opinion that the defendant, who was terre-tenant of land encumbered by a rent-charge in fee, was not liable at law on the covenant, but only in equity. (5 Mod., *Page 87 
374; 12 id., 166; 1 Salk., 198; 2 id., 615; 3 id., 340;Lord Raym., 317; Carth., 438; Comb., 424, 466; Holt, 175, 669.) This case, though reported in a great many books and often made the subject of reference and comment, does not appear to have been correctly understood. The owner of the land had granted a rent-charge in fee, and there was an indorsement on the back of the deed that the rent was to be paid without any abatement for taxes; and the covenant to pay the rent without deduction was confirmed by another deed executed by the grantor to the grantee several years afterwards. The defendant was in possession of the land under the grantor of the rent, but it did not appear in what character. Afterwards, a parliamentary tax of four shillings on a pound was levied upon the land, and the act declared that tenants might stop the tax out of their rent; but there was a proviso that nothing contained in it should make void any agreements between landlord and tenant. The action was brought to determine whether the defendant could deduct the tax from the rent. It was in form an action upon a wager, the defendant affirming that he had a a right to make the deduction. The determination, according to nearly all the reports, was that the plaintiff was entitled to the whole rent, without deduction. So far the case has no application to the point now under consideration. But a question as to the liability of the defendant, assuming him to have been the assignee of the land, was then started by Chief Justice HOLT; and from what he is reported to have said, his authority has been often cited for the doctrine that a covenant for the payment of such a rent does not run with the land so as to bind the assignee. Some of the reports of the case warrant that inference; but the books in which it is more carefully reported show that his distinction was between a provision for a deduction for taxes which was parcel of the grant of the rent, and a separate covenant providing for such a deduction. The latter, which he considered the case before him to be, he held to be personal, and that it did not affect the assignee of the land. Thus, according to the report in 12th Modern, he said there was another point on *Page 88 
which he had not consulted his brethren, which was whether the defendant was chargeable on the covenant. "If this rent was sogranted to be paid, he said, it would be another matter; but here is only a covenant, and no words amounting to a grant, and therefore there can be no relief in this case against the terre-tenant but in equity." The Reporter adds: "But the other three judges thought this covenant might charge the land, being in the nature of a grant, or at least a declaration going along with the grant, showing in what manner the thing granted should be taken, and reckoned the indorsement a part of the deed. And so judgment was given for the plaintiff." This seems to have been the second time the case was spoken to by the judges. On the first occasion, according to the report in 5th Modern, the distinction, between the general covenant to pay the rent, and the particular one by which it was agreed not to claim a deduction for the taxes, is apparent from what is stated as the opinion of the court. It is said that the judges "were of the opinion that the plaintiff had no remedy at law upon this covenant [not to deduct the taxes] against the now defendant, for he was only a terre-tenant and could not be charged as assignee, because the covenant did not run with the land, neither was it annexed to the thing granted [the rent], and therefore he ought to bring an action against the grantor or his heirs; for this covenant does not extend to any thing or parcel of the demise, but to taxes which had not existence at that time, and is forthat reason a personal covenant by which the heir may be charged in respect to assets descended, and not otherwise. He might have remedy in equity against the assignee but not at law," c. The report in 1st Lord Raymond, on a careless reading, would seem to convey the idea that the Chief Justice thought that an action would not lie against the assignee upon the general covenant to pay the rent; but when he illustrates his idea by an example, it is plain that he refers only to the covenant respecting the taxes. He puts the case of an avowry in replevin to try the legality of a distress, and a plea in bar of rien arrere, and says the avowant could not have replied this covenant *Page 89 
against the terre-tenant, but that he could against the grantor and his heirs, to prevent circuity of action. Unless the covenant respecting taxes was the one referred to, the example would be absurd. The original grant, according to the report in Carthew,
contained a clause of distress; and the grantee could distrain for the rent granted without regard to the ownership of the land. The meaning of Lord HOLT was, that the covenant respecting the taxes was a personal arrangement between the grantor and the grantee, which bound them and their heirs but did not qualify the original covenant annexed to the grant of the rent, and consequently did not affect the assignee or terre-tenant. As the act of Parliament allowed the tenant to deduct the tax where there was no agreement to the contrary between the landlord and tenant, and as the covenant respecting taxes was personal between the original parties, the terre-tenant, not being affected by it, could deduct the taxes. But even in this distinction the Chief Justice was overruled by his brethren, who considered that the particular covenant went "along with the grant." The great authority of Lord HOLT appeared to me to make it necessary to explain the real drift of his opinion, though it was a dissenting one; especially as he is often quoted to sustain a doctrine to which he has given no countenance. (Platt on Covenants, 65, 475.)
WILMOT, Ch. J., in Bally v. Wells (Wilmot's R., 349), is reported to have said that he thought Lord HOLT'S opinion, which he understood in the sense generally attributed to it, wrong, and that the better opinion was that an assignee of the land in such a case was liable. Roach v. Wadham (6 East, 289), was covenant to recover the arrears of a rent-charge reserved upon a conveyance in fee to uses, and the defendant was sought to be charged as the assignee of the grantee of the land. The answer made to the action was, that the defendant did not take as assignee, but under an appointment created by the original conveyance. It was tacitly assumed by the counsel for the defendant, Mr. ABBOTT, afterwards the renowned Chief Justice, and by Lord ELLENBOROUGH, Ch. J., who delivered *Page 90 
the opinion of the court, that if the defendant did take as assignee he was liable for the rent; but the effort was to show that his title arose upon the deed of appointment, and it was so held by the court. That so little is found upon the question in the English reports is no doubt owing to the consideration that such reservations are infrequent, and that where they exist the remedy by distress or reentry has usually proved adequate for the recovery of the rent. The question has been examined by Sir EDWARD SUGDEN in his treatise before referred to. He shows that the commissioners appointed to report upon the state of the law of real property have treated the question as a doubtful one. His own conclusion is, that such covenants "ought to be held to run in both directions, with the rent or interest carved out of or charged upon it [the land] in the hands of the assignee, so as to enable him to sue upon them, and with the land itself in the hands of the assignee so as to render him liable to be sued upon them." (Vol. 2, 492.) There seems to be no distinction favorable to the defendant between a perpetual rent-charge granted by the owner of an estate, and a like rent reserved by a conveyance in fee by indenture, where the grantee covenants for himself and his assigns to pay it. LITTLETON places them in the same category, without intimating that there is any legal difference between them. (§§ 217, 218.) The covenants cannot be less available where the grantor of the rent received the title by the same instrument by which the rent is created, than if he acquired it by prior title from another person. If there is a difference, the owner of the rent under the former method is entitled to the greater favor; for the constructive notice derived from the record of the grant of the rent would be less likely to come to the actual knowledge of a subsequent purchaser of the land, than if it were contained in the chain of conveyance through which such purchaser would be obliged to trace his title, which would be the case if it were reserved upon a conveyance of the land. If there is any peculiar significance in the term "grant," as some of the judges, in *Page 91 Brewster v. Kidgill, seem to have supposed, it is found in this conveyance.
The defendant's counsel maintains that the burden of covenants like that in question cannot be made to run with the estate of the covenantor in the land, however strongly expressed in the deed, except there be a reversion in the covenantee. The reason is not apparent upon any theory. We can see a plausible though artificial reason why the benefit of such covenants should not pass to the assignee of the covenantee. The latter having transferred his whole estate in the land to the covenantor, no reversion arises; and when he afterwards comes to assign the benefit of the covenants, there is no vinculum between him and his assignee upon which a privity of estate can be predicated. It is difficult to say that the transfer in such a case is anything more than the assignment of a chose in action, and it may be, as I have supposed, that it required a statutory authority to give effect at law to the transfer. But there is a certain privity between the grantor and grantee of the land. It is not the privity arising upon tenure, for there is no fiction of fealty annexed. It is, however, the same sort of privity which enables the grantee of a purchaser to maintain an action upon the covenants of title given to his vendor; and it is moreover a privity of the same nature with that which obtains between the grantor and grantee of terms for life and years. It is notorious that the grantee of a term is liable upon covenants which are in their nature capable of running with the land, such as covenants to pay rent, to repair and the like, which his grantor made with the owner of the reversion. In this case there is, it is true, a reversion, and that may be indispensable to enable the covenantee to assign the obligation made to him; but it is not easy to see how, upon any kind of reasoning, the presence or absence of a reversion can affect the relations between the party primarily chargeable upon the covenants and another to whom he conveys the land, charged with the performance of these covenants. It is obvious that the fiction of feudal tenure has nothing to do with the case. In all grants of *Page 92 
land by the people of this State the tenure is allodial and not feudal (1 R.L., 71, § 6); and since 1830 all lands are by statute allodial, and feudal tenures and all their incidents are abolished. (1 R.S., 718, § 3.) There is a saving as to rents and services already created. (§ 4.) If a term should now be created in land held under a patent from the State, or (since 1830) in any land, the lessee covenanting to pay rent and to repair, no one, I suppose, would doubt but that the covenants would run with the land on the one side and with the reversion on the other; and yet there would be no feudal relation, in fact or in theory, between the parties. If we hold that a feudal tenure is essential to enable the burden of covenants to run with the land, we must decide that there was, prior to 1830, a difference between land, the title to which is derived under a royal grant, and that held under a patent from the State, in respect to the capacity of covenants to run with the land; for as to the former there was a fiction of tenure, while the latter was purely allodial.
I am, moreover, of opinion that the second section of the "act to enable the grantees of reversions to take advantage of the conditions to be performed by the lessees," has an important bearing upon this question. That section gives the assigns of grantees of land the same remedies against the assignees of the grantors which the grantees themselves had against the grantors; and the act of 1805 applies all the provisions of that statute to grants in fee reserving rent. To enable the last mentioned act to have any operation, the grantees of the reserved rent, upon conveyances in fee, must be assimilated to the grantees of reversions. The act, in effect, establishes a privity of contract between those holding a derivative title under both grantors and grantees; and the intention of the Legislature, apparently, was to place the assignees of both parties upon grants in fee, where a rent was reserved, upon the same footing which was occupied by the assignees of the parties to a lease for life or years, under the statute of Henry VIII, and the reenactment of it in this country. *Page 93 
The courts of this State have always assumed that the assignees of the grantee, upon leases of this description, were liable for the rent accruing after the assignment, to the grantor and his representatives. Watts v. Coffin, before referred to for another purpose (11 John., 495), was covenant against the assignee of the grantee in fee to recover rent. The defence set up was a breach of a covenant of the grantor, but it was not pretended that the defendant was not generally liable. The judgment was for the plaintiff.
Lush v. Druse (4 Wend., 113), was covenant for rent upon a grant in fee by the executrix of the grantor against the assignee of the lease, and the plaintiff recovered; the questions discussed being whether there was a true description of the premises, and whether the plaintiff was entitled to interest, and some others; but no objection was taken that an assignee was not liable. Van Rensselaer v. Bradley and Van Rensselaer v.Jones, both before referred to, Van Rensselaer v. Gallup (5Denio, 454) and Van Rensselaer v. Roberts (id., 470) were all actions for rent on similar grants by the executors of the grantor against the assignees of the grantee. They were defended on other grounds than those now taken. In the case against Gallup, a new trial was ordered because the plaintiff had recovered too much, and in all the others the plaintiff had judgment. Van Rensselaer v. Jewett, in this court (2Comst., 135), was likewise against an assignee of the grantee at the suit of the grantor's executors to recover rent reserved on a grant in fee. The only question made was in regard to interest; and the judgment for the plaintiff was affirmed. The recent decisions made in the Supreme Court, after the present defence began to be interposed, have been in favor of the right of recovery; but as they have not been acquiesced in, the cases may be considered as under review upon this appeal. (Main v.Feathers, 21 Barb., 646; Van Rensselaer v. Bonesteel, 24id., 365.) But the other cases present an uninterrupted course of adjudication, extending through a period of nearly half a century; and in every case where a recovery was had, it was necessarily affirmed that these covenants, as to their *Page 94 
burden, run with the estate of the grantee in the land; as those referred to under the preceding head determined that their benefit accompanied the estate of the grantor in the rents. The decisions, moreover, accord with the plainly expressed intention of the parties to the conveyances, and were necessary to enforce the apparent object of the arrangements which they had voluntarily entered into. Their effect as precedents does not depend upon the court having passed upon the validity of the reasoning by which the defence is now sought to be sustained, but upon the universal acquiescence of the tribunals, the legal profession and the community in the result of the positions upon which the plaintiff insists. It is the same kind of evidence upon which a large portion of the principles of our system of laws has been established. If it could be satisfactorily shown that the principle thus acquiesced in, and acted upon for so long a time, involved some logical fallacy or some departure from the true theory of tenures or from the course of adjudication in the English courts, we should not, in my opinion, be at liberty for such reasons now to change the rule. But if it could be done in any case, we ought to require of the party invoking the change to make it perfectly plain that an error had been committed. But, so far as my researches have gone, I have failed to meet with a single case in which it has been adjudged that the assignee of the estate of the grantee, upon such a conveyance as the one now under consideration, was not liable to the grantor or those legally representing him, upon the covenants for the payment of rent; and we have seen, moreover, that one of the most eminent of English lawyers and judges, upon a full examination of the question, has formed and published his opinion, to the effect that the positions of the defendants are untenable. In determining upon the influence which the course of adjudication in our own courts ought to have upon the judgment we are now to give, we cannot lose sight of the consideration that all parties interested in this species of property have been encouraged to act, and have, beyond all doubt, acted for many years upon the assumption that they were, on the one hand *Page 95 
entitled to the benefit of, and subject on the other to the burden of the remedies now sought to be enforced. It is natural that sales and purchases, testamentary provisions for children, settlements upon marriage, trusts for the payment of debts, and the numerous arrangements incident to the ownership of real estate, should have been entered into in the belief that a series of judgments assuming a particular state of the law, could be safely confided in.
It was stated upon the argument that the questions which have been discussed were suggested by the decision of this court in the case of De Peyster v. Michael (2 Seld., 467); and the defendant's counsel insisted that his views were sustained by the judgment in that case. The point determined was, that a condition in a conveyance in fee reserving rent, providing that the grantee and his assigns should not sell or dispose of the land without first offering it to the grantor, his representatives or assigns, and that upon every sale to another either the seller or purchaser should pay to the grantor, or those representing him, one-fourth part of the purchase price, was void as repugnant to the estate granted and an illegal restraint upon alienation. The action was ejectment to recover the premises, and the plaintiff was defeated. I have attentively examined the reasoning of the learned Chief Judge who delivered the opinion, in nearly all of which I concur, as I do entirely in the result. I consider the judgment as standing firmly upon the position that a condition to pay a quarter of the value of the land, including all the improvements which might be put upon it upon every alienation, however frequent, which the circumstances of the owner might oblige or incline him to make, is substantially equivalent to a total restraint upon alienation, and that it is quite repugnant to the nature of a fee simple estate. The Chief Judge was careful to distinguish such a restraint upon alienation from the reservation of an annual rent. "Rent," he said, "is separable from the ownership in fee of the land. The reservation of rent does not affect the alienation of the tenant's interest in the land. The reservation of the sale-money *Page 96 
restrains, and may destroy it." Again, he said: "The covenant of the lessee to pay, which runs with the land, and the lessor's right to reënter for the non-payment, are practically a sufficient security for the rent." If the reasoning of the opinion gives a somewhat greater effect to the statute of quiaemptores, and some other acts referred to, than I have attributed to them, it does not affect the conclusion which was arrived at. Indeed, upon the judge's assumption that the statute was not a part of the law of the Colony, but took effect in this State only from its enactment by our Legislature, it is difficult to say what influence it could have upon the conveyance under consideration in that case, which was executed in 1785, two years prior to the passage of the statute of tenures. There is no retrospect attached to the 1st section of that act, which is the only one which relates to subinfeudation, or the reserving of a tenure to the grantor upon a conveyance. The remainder of the act is a reenactment of the material provisions of the 12 CharlesII (ch. 24), which abolished the military and some other incidents of tenure, and changed all tenures into free and common socage. The 5th section, adverted to by the Chief Judge and relied on in one of the opinions in the Supreme Court in the present case, is a reenactment of the material provisions of the 5th section of the act of Charles, and its object was to preserve rents and services certain belonging to socage tenure, and the fealty and distresses incident thereto, which a possible construction of the prior sections, as it was thought, might have taken away. The purpose of the 14th section of the act of 1779 (1Jones Var., 44), was simply to vest in the State of New York the rights and interests which the Crown of Great Britain held in and concerning property in this country, prior to the Revolution. I cannot see that it has any application to tenure or to conveyances or contracts between individual citizens.
I have not failed to look into the cases cited on the argument from the reports of other States in the Union; but before referring to them I desire to repeat that as to the right of an assignee of the rent arising upon conveyances in fee, to sue *Page 97 
upon the covenants, I put my opinion upon the statute of 1805, and the laws reënacting it, though it will be seen by the cases yet to be referred to that there is reasonable ground to affirm that such actions could be sustained at common law. Rents reserved on conveyances in fee appear to be in extensive use in Pennsylvania; and many questions respecting them have been considered by their courts. Philips v. Clarkson (3 Yeates,
124, A.D. 1800), was an action of covenant for rent by an assignor of the grantor of the land in fee against the original covenantor, and the plaintiff recovered judgment. Hurst v.Rodney (1 Wash. C.C.R. 375, A.D. 1806, for the Penn.Dist.), was by the covenantee against the grantee of the covenantor. Judge WASHINGTON said that the covenant ran with the land so long as it was retained by the defendant. In Herbaugh
v. Zentmyer (2 Rawle, 159, A.D. 1828), the parties were grantees respectively of the original parties. It was held that the covenant ran with the land, and the position was sustained by a copious reference to English authorities. Royer v. Ake (3Penn., by Penrose Watts, 461, A.D. 1832), was by the grantor of the land against the assignee, by mesne conveyances, of the grantee, and the point was taken that the covenant was merely personal, and did not bind the defendant. The court said it was a covenant which ran with the land, and was binding on the assignee as long as he continued to be assignee. In St. Mary'sChurch v. Miles (1 Whart., 229, A.D. 1836), the plaintiff and defendant were respectively the grantees of the original parties, and the plaintiff recovered; the defence being that the rent was extinguished by not being claimed for thirty years. It was not suggested in any of these cases, which were all upon grants in fee reserving rent, that the Pennsylvania law of tenures differed from that which prevailed in England; but whenever a question was made as to the covenants passing to the assignees of the original parties, it was answered by English authorities respecting conveyances subject to the statute ofquia emptores. But in Ingersoll v. Sergeant (1 Whart.,
337), decided subsequently to the foregoing cases, it was considered that a rent reserved on a conveyance *Page 98 
in fee was a rent-service and not a rent-charge. The action was replevin to try the legality of a distress in a case in which the landlord had granted a portion of the land charged with the rent in fee, which deprived him of the right to distrain if it was the case of a rent-charge. It was considered that the statute ofquia emptores was not a part of the law of that State, and the position was based upon the charter to Penn, and certain statutes of the State respecting escheats. Without going into this question of local law — though I cannot but think the consequences of the doctrine may be found embarrassing if generally applied — I am of opinion that the prior cases in that State have established the doctrine of the general availability of these covenants between parties holding derivative titles in a manner not to be shaken by the dicta of the last mentioned case.
The question came before the Supreme Court of the United States in a case arising in Virginia in 1833. The deed contained the same covenants and clauses of distress and reëntry as the one under consideration. The action was covenant for rent in arrear, and the plaintiff was a grantee of the rent under the original grantor, and the defendant the grantee and covenantor. The opinion of the court was delivered by Judge STORY, and his conclusion upon the right of the plaintiff to sue is expressed as follows: "Upon full consideration we are of opinion that the assignee of a fee farm rent, being an estate of inheritance, is, upon the principles of the common law, entitled to sue therefor in his own name. It is an exception from the general rule that choses in action cannot be transferred; and standing upon the ground of being not a mere personal debt, but a perdurable inheritance." (Scott v. Lunt's Administrators, 7 Pet.,
606.)
It is argued by the defendant's counsel that a reversion in the grantor is essential to enable an obligation to pay rent to attach to any one except the party originally bound to pay it, or to enure to the benefit of any one deriving title from the party in whose favor it was reserved; and the want of a reversion in Van Rensselaer is the circumstance which is supposed *Page 99 
to create the difficulty under which the plaintiff labors. But there are several cases in hostility to this doctrine. InMcMurphy v. Minot (4 N.H., 251), the plaintiff, tenant for life, demised the premises to the owner of the reversion, reserving an annual rent, which the latter covenanted to pay, and afterwards conveyed the premises to another, under whom the defendant entered. The action was covenant for rent in arrear, and it was urged that the lessee, being seised of the whole estate in fee simple, his covenant to pay the rent could not be enforced against his grantee; but it was held that a reversion in the plaintiff was not essential, and the plaintiff had judgment. It is settled, by a series of adjudications in England and in this country, that if one possessed of a term for years demise it, reserving rent, and afterwards assign the rent, the assignee may maintain debt for the rent against the lessor. (Allen v.Bryan, 5 Barn. Cress., 512; Demarest v. Willard, 8Cow., 206; Willard v. Tillman, 2 Hill, 274; Childs v.Clark, 3 Barb. Ch., 52; Kendall v. Carland, 5 Cush.,
74.)
The result of the examination which we have given to this case is, that these covenants are available in favor of the plaintiff; and that the defendant, as the owner under Dietz of a portion of the land granted, is liable in this action for a breach of them: and we, therefore, affirm the judgment of the Supreme Court.
JOHNSON, Ch. J., COMSTOCK, GRAY and GROVER, Js., concurred; SELDEN and STRONG, Js., delivered opinions in favor of affirming the judgment upon grounds differing, in some respects, from those adopted by the court; ALLEN, J., being interested in the question, took no part in the decision.
Judgment affirmed. *Page 100