CHARLES H. KAVANAUGH, Plaintiff, *v.* COHOES POWER AND LIGHT CORPORATION, Defendant.

(Supreme Court, Albany Trial Term, March, 1921.)

Contracts — equitable interpretation.

Conveyance — reservation of rent and right of re-entry for non-payment in perpetual leases creates an estate upon condition — relationship of landlord and tenant — tenant estopped from asserting rights by prescription.

In the interpretation of a contract the court will endeavor to give it the construction most equitable to both parties instead of a construction which will give one of them an unfair and unreasonable advantage over the other.

Where a conveyance of land to the grantee, his executors, administrators and assigns forever, contains a reservation of perpetual rent, and the right of re-entry for non-payment, the estate created is upon condition and not in fee simple. Such a conveyance creates the relationship of landlord and tenant, and the tenant is estopped from asserting any rights by prescription.

In an action by the purchaser from the tenant of lands held under such perpetual leases, where the tenant had defaulted in the payment of the rent and the landlord and tenant had entered into a contract, after such default of which the purchaser had knowledge, *held,* that the rights of the purchaser were determined by the contract which, fairly construed, limited the purchaser to the amount of water power fixed in the leases and described in the contract and excluding certain excess water power claimed by prescription and estoppel, and that defendant was entitled to a dismissal of the complaint and to an affirmative judgment on its counterclaim cancelling and annuling the leases pursuant to such contract.

ACTION to determine water power rights.

Brackett, Todd, Wheat & Wait, for plaintiff.

Ingraham, Sheehan & Moran, for defendant.

HINMAN, J. The plaintiff purchased certain lands in the city of Cohoes from the estate of Charles H.

Adams for the purpose of obtaining certain electric power rights from the defendant, a corporation which has installed a hydro-electric power plant in the city of Cohoes. This power plant was installed for the purpose of supplying electric power in the place of water-power which had been supplied for many years in that city by the predecessor of the defendant. The plaintiff's predecessor in title had been supplied with water-power rights under instruments which may be here denominated as perpetual leases, obtained from the predecessor in title of the defendant.

The plaintiff having purchased the lands in question with certain power rights attached thereto from the estate of Charles H. Adams is now demanding judgment from this court determining the quantity of water-power which said premises were entitled to use on the 12th day of December, 1913, the date on which the property of the Adams' estate was destroyed by fire as will hereafter appear, and what quantity of water-power the said lands were entitled to use on the 13th day of October, 1917, the date of the purchase of the premises by the plaintiff and what power rights were acquired by the plaintiff when he purchased said lands on said date.

The plaintiff is further seeking judgment of this court requiring the defendant to enter into a contract with the plaintiff for the supplying of a quantity of electric power equal to the water-power which this court shall determine the said lands were entitled to use at the time when the plaintiff purchased the same and further judgment fixing the damages which the plaintiff has sustained by reason of the defendant's failure and refusal to enter into such a contract and granting the plaintiff judgment for the amount of such damages.

The defendant defends upon the ground that the rights of the parties have been fixed and determined

by a contract between the defendant and the estate of Charles H. Adams which it is claimed fixes the obligations of the defendant as to the amount of water-power or electric power which the defendant can be required to furnish, namely, the equivalent in electric power of six mill-power, defined in the so-called perpetual leases, rather than the quantity claimed by the plaintiff, namely the equivalent of fourteen and eighty-two one-hundredths mill-power, the difference between which amounts the plaintiff claims he is justly entitled to receive by virtue of prescriptive rights vesting in the estate of Adams which the defendant is estopped to deny and by virtue of a further estoppel running against the defendant in connection with the amount of mill-power or electric power which the defendant is estopped to deny the said lands were entitled to use at the time when the plaintiff purchased.

The defendant, relying upon said agreement between itself and the estate of Charles H. Adams as fixing the rights of the parties, alleges that there was a failure on the part of the plaintiff and said Adams' estate to perform on their part the conditions by them to be performed and demands by way of counterclaim that it have judgment, that the said perpetual leases have been cancelled and surrendered and that upon compliance by the defendant with the terms and conditions of the said agreement between the defendant and the said Adams' estate, the said leases be cancelled and surrendered.

The theory developed by the plaintiff upon the trial seems to me to have deviated from the theory reasonably to have been implied from his pleading to the extent that whereas in the pleading it would appear as a reasonable conclusion that the plaintiff relied upon the said agreement to fix his rights, the proof develops a theory based upon estoppel. The court reached the conclusion during the conduct of the trial that it was not necessary to plead the estoppel and

great liberality was shown to the plaintiff in permitting introduction of testimony upon the theory of estoppel over the protest of the defendant. The result has been that the problem has been complicated by requiring the consideration of many matters which otherwise would not have been permissible if the theory of the plaintiff had been a reliance upon said agreement.

The court has not changed its mind with reference to this liberal view of the plaintiff's contention and has determined to consider the testimony offered in relation to the matters other than the contract itself for the purpose of shedding such light upon the said contract as may be possible for the purpose of determining its true intent and meaning and for the purpose of determining whether the plaintiff can justly claim any rights by estoppel as against the defendant.

The chief facts leading up to the making of the agreement between the defendant and the estate of Charls H. Adams which was executed October 16, 1916, should be known for the purpose of a proper understanding of the situation of the parties at the time of its execution. Prior to 1849 the Cohoes Company, the predecessor of the defendant, had constructed and thereafter maintained a dam in the Mohawk river above the Cohoes falls by means of which it diverted the waters of said river into a system of canals owned and maintained by it, located in Cohoes and distributed water through said system of canals to various mill and factory sites and the same was used for power and other purposes.

On October 17, 1849, the Cohoes Company by an instrument in writing demised, leased and to farm let unto Egbert Egberts, his executors, administrators and assigns forever, the premises in question, together with the privilege and right to draw from one of the canals of said company a certain amount of water therein prescribed at a certain definite

yearly rental. By the terms of this instrument the Cohoes Company was entitled to re-enter into and upon the demised premises and repossess itself of the same upon default in the payment of such rent.

About January 1, 1852, the said Egbert Egberts assigned his interest in said premises with the water rights appurtenant thereto to Charles H. Adams. Thereafter and by written instrument dated January 2, 1866, the Cohoes Company granted to the said Charles H. Adams, his heirs, administrators, executors and assigns, the further right and privilege as appurtenant to the lands and premises described in said lease to said Egberts, additional water for what was defined as four mill-power in said instrument upon the payment of further and additional yearly rent therefor.

The said Charles H. Adams died about 1902 leaving a last will and testament which was admitted to probate in January, 1903. William P. Adams, named as one of the executors and trustees, alone qualified as such and continued to be and act as such executor and trustee until after the sale of the premises in question to the plaintiff herein.

A mill was maintained on the said Adams premises for more than thirty years prior to December 12, 1913, when the same was destroyed by fire. There was no measuring device utilized to determine the amount of water-power used at any time.

In June, 1910, the Cohoes Company caused a measurement of the quantity of water passing through the said mill to be made and it was found that the mill was using at that time an average of fourteen and eighty-two one-hundredths mill-power instead of the lesser quantity fixed by the said leases. The measurement made in June, 1910, was apparently the only measurement made during the period of said leases.

After making the measurements of water power at said premises in June, 1910, the Cohoes Company notified said Adams of the measurements and called upon him to pay the additional rent commensurate with the additional water power which was being used. It seems that for more than thirty years the premises had not been used by Adams but the space therein had been rented by Adams to various tenants, who utilized the water power furnished. When called upon to make such additional rent payments said Adams notified the Cohoes Company that the revenue from his tenants would not warrant his paying the amount so demanded and the Cohoes Company permitted the use of said water-power upon the continuance of the payment of the rental prescribed under the leases of 1849 and 1866.

The testimony fails to show that the said William P. Adams, the executor, or the said Charles H. Adams, ever knew the number of mill-power utilized on said premises prior to the measurements made by the Cohoes Company in 1910, and neither ever at any time claimed the right as against the Cohoes Company to use water-power on said premises in excess of the quantity specified in the said instruments of 1849 and 1866.

In or about the year 1913, the Cohoes Company formulated a plan for the utilization of the water-power of the Mohawk river in the generation of electric power at a central station and the distribution of such electric power among its many lessees and other users of power in the city of Cohoes in the place and stead of the water-power then and theretofore furnished through its canal system. In order to carry out its plan of conversion from water-power to electric power it was necessary to enter into new agreements with the several lessees using water-power for the substitution of electric power in its stead.

Extended negotiations were entered upon between the said Cohoes Company and its lessees for this purpose which resulted in the preparation of forms of contract whereby the lessees agreed that the Cohoes Company might use the water-power for the generation of electricity at such station, on its agreement to furnish a specified quantity of electric power to the said lessees in place and stead of water-power.

During the progress of such negotiations which lead up to the said forms of contract the lessees of the Cohoes Company who had used water-power additional to the quantity specified in their respective leases and had paid therefore at the rate per mill-power stipulated in their respective leases, asserted a right to the continued use of such water-power, which right was always disputed by the Cohoes Company. To induce the said lessees to enter into contracts for electric power in lieu of water-power, the Cohoes Company consented that the form of contract should contain a clause admitting the right of any lessee who signed such contract to the use of such additional water-power and the forms of contract so prepared recited the use of water-power in addition to that specified in the respective leases and provided for the furnishing of an equivalent of electric energy in lieu of such excess water-power at the same rate per kilowatt hour as the electric energy to be supplied in lieu and stead of the water-power specified in the respective leases.

The said William P. Adams, as executor of the estate of Charles H. Adams, never took part and never was represented in any of the negotiations leading up to the preparation of such forms of contract. The forms, however, as prepared, were printed and sent to said Adams. The final form was agreed upon between the lessees taking part in the negotiations and the Cohoes Company in the year 1916, and a

printed copy of what is known as the "Knitters' Contract" was sent to said William P. Adams, and contained among other recitals the following:

"WHEREAS, the Grantor (the Cohoes Company) has granted and the Grantee (Charles H. Adams Estate) has been for years furnished and has become entitled to receive from the Grantor additional water to the amount of 8.82 mill power, at an additional yearly rent of $ .00, which additional mill power is agreed to be furnished to the Grantee as appurtenant to and inseparable from said lands described in said hereinbefore recited Indenture and by reason of the grant of said lands therein described which additional mill power with the mill power described in said hereinbefore recited Indenture aggregate 14.82 mill power and which rents aggregate an annual rent of $1200.00."

Said form of contract provided for the confirmation of the demise of the premises described in the instrument of October 17, 1849, with the right and privilege as appurtenant to and inseparable from said lands, to draw and take from the electric service connections of the Cohoes Company at or near the point or points where its service conductors enter the premises, 233,918 kilowatt hours of electric energy yearly in each calendar year between certain hours and for a certain number of working days in the year and to be taken at a certain rate. Said Adams estate was to pay to the Cohoes Company therefor at the rate of $1,200 per annum in quarterly payments of $300. It is to be especially noted that the $1,200 was the aggregate of the rental for water-power under the instruments of October 17, 1849, and January 2, 1866, and that the said 233,918 kilowatt hours of electric energy yearly was the equivalent in electric energy of six mill-power in water-power, the amount prescribed in the said instruments of 1849 and 1866. This form of contract

was never executed by either party. The said form was retained by said Adams and was delivered by him to the plaintiffs at the time of the sale of the Adams' interest in the said premises which took place in October, 1917.

All of the lessees of the Cohoes Company with the exception of said Adams and one or two others, executed contracts for the substitution of electric energy in the place and stead of water-power. Such contracts provide for priorities in the use of electric power in the event that the Cohoes Company is unable to furnish each lessee his full requirement due to low water in the Mohawk river in dry seasons. For the purpose of establishing such priorities it is provided in such contracts that the persons, firms and corporations enumerated on a schedule thereto attached who shall grant to the Cohoes Company prior to March 13, 1917, the right to take and use for the generation of electric energy water to which they are entitled under their respective leases or otherwise, and to whom the Cohoes Company has granted or may grant the right to take and use for power purposes electric energy so generated, shall be known as " indentured grantees of electric energy" and entitled to the priorities as specified in said agreement. The said schedule in respect of the premises in question in this litigation set forth the name of Charles H. Adams as an indenture grantee under the grants of 1849 and 1866 and set forth the number of mill-power granted by such indentures as six mill-power, and under a heading " No. of Mill Power to which entitled other than by written grants," the figure 8.82, and under a heading, " Total Mill Power," the figure 14.82.

The said Charles H. Adams' estate did not, prior to March 13, 1917, grant to the Cohoes Company the right to take and use for the generation of electricity

water to which it was entitled, nor did the Cohoes Company prior to said date grant to said estate the right to take and use electric energy for power purposes, and the said Charles H. Adams' estate never became an " indentured grantee of electric energy " within the meaning of said schedule, and as to said Adams' estate the said schedule became wholly ineffective.

The Adams' mill on the premises in question was destroyed by fire in December, 1913, and has not been rebuilt. Said premises at all times since have been vacant and unoccupied and the Adams' estate discontinued the payment of rent for about three years subsequent to October, 1913. The amount of back rents amounted to $3,600, at the time of the agreement between the defendant and the Adams' estate of October 16, 1916. By reason of such default the Cohoes Company was entitled to re-enter into and upon the demised premises and repossess itself of the same. Instead of doing so, however, the Cohoes Company entered into an agreement with the executor of the Adams' estate on October 16, 1916. Since this case is to be largely determined by the exact language of this agreement it is important to consider its exact language. It reads as follows:

" Memorandum of agreement made this 16th day of October, 1916, between the Cohoes Company, a corporation duly organized under the laws of the State of New York, party of the first part, and William P. Adams, as executor of the Estate of Charles H. Adams, deceased, party of the second part.
          *Witnesseth:*

" Whereas the Charles H. Adams' Estate is the owner and holder of two certain indentures of lease of land and water power made by the Cohoes Company under date of October 17th, 1849, for two mill

Supreme Court, March, 1921.   [Vol. 114.

power, and January 2nd, 1866, for four mill power, and

" Whereas the mill and buildings located upon the premises in the City of Cohoes, described in the aforesaid grants have been destroyed by fire.

" *Now therefore,* this agreement witnesseth:

" The party of the first part hereby agrees that for a period of one year from this date it will institute no steps, legal or otherwise, for reentry upon the leased premises or to recover the rents now past due and in arrears, amounting on the 1st day of October to the sum of Thirty-six hundred (3600) Dollars, and that during the said period of one year from the date of this agreement the party of the second part shall have full and free opportunity to sell its interest in the property described in the said leases of land and water power.

" In case the interest of the party of the second part in the said lands is not sold before the expiration of the period of one year from this date, then the party of the second part hereby agrees to surrender and cancel the said grants made by the Cohoes Company, upon the waiver by the party of the first part, of all rents due and in arrears, and the payment by the party of the first part to the party of the second part of the sum of Fourteen hundred (1400) Dollars.

" It is further agreed between the parties hereto that in case a sale should be made by the party of the second part of its interest in the property described in the said grants, that said sale shall be upon the express condition that the purchaser shall, upon taking title, pay to the party of the first part all rents then past due and in arrears, and sign, execute and deliver with the Cohoes Company a contract for electrical power in the place and stead of the water power

referred to in said grants, in either the knitting mill or bat mill form of electrical contract, as said purchaser shall then elect.

"It is further agreed between the parties hereto that the party of the second part shall have the right to cancel and surrender the above mentioned grants of land and water power at any time which it may desire, prior to the expiration of one year from the date hereof, and upon such cancellation and surrender the party of the first part shall waive and release all payments for rent in arrear, and the party of the first part shall pay unto the party of the second part the sum of Fourteen hundred (1400) Dollars.

"*In Witness Whereof* the parties have hereunto set their hands and seals the day and year first above mentioned.

> "COHOES COMPANY,
>> "By LORENZO SEMPLE,
>>>          "*President.*
> "WILLIAM P. ADAMS, as Executor of
>> "the Estate of Chas. H. Adams."

By this agreement of October 16, 1916, the Cohoes Company agreed to waive said default in the payment of rent and the consequences thereof including its rights to re-enter and repossess itself of said premises upon the condition that if the Adams' estate should sell its interest in said premises within one year from the date of said agreement such sale should be on the express condition that the purchaser upon taking title would pay all rent in arrears and sign, execute and deliver with the Cohoes Company a contract for electric power "in the place and stead of the water power referred to in said grants." The "said grants" referred to in the agreement are the grants of 1849 for two mill-power and of 1866 for four

mill-power. At least that is the contention of the defendant, the defendant claiming that the words above quoted are words of limitation and necessarily refer to the quantity of power. The plaintiff contends, however, that it is the fair interpretation of the contract that reference to the grants was not intended to limit the quantity of power but was descriptive of the kind of power to be displaced. It is conceded that the agreement was drawn by the president of the Cohoes Company, and it is contended by the plaintiff that any ambiguity in the contract should be construed most strictly against the party who prepared it. The importance of this question to both of the parties is seen when we consider that the difference in rate of charge for electric energy that would be paid to the company or saved by the plaintiff in connection with the additional mill-power in dispute, would be the difference between about one-half cent per kilowatt hour if covered by the agreement and one and one-half cents per kilowatt hour if not covered by the agreement and if the regular rate of the company as fixed by its schedules filed with the public service commission is to prevail.

On October 13, 1917, three days before the expiration of said agreement between Adams and the Cohoes Company, the said William P. Adams as executor of the estate, by an instrument in writing, conveyed to the plaintiff the premises in question, together with all power rights under the instruments of 1849 and 1866 " together with all rights to extra water power acquired by Charles H. Adams, deceased, by reason of the use of water power in excess of that set forth in said leases." The sale of the interest of said Adams, so made by the instrument of October 13, 1917, was not upon the express condition that the plaintiff should upon taking title, or at any other

time, pay to the Cohoes Company the rents then past due, or sign, execute or deliver with the Cohoes Company a contract for electric power in the place and stead of the water power referred to in the instruments of 1849 and 1866, nor did the plaintiff by said instrument agree to execute any contract for electrical power, or assume any obligation with respect thereto.

On October 13, 1917, however, the executor of the Adams' estate paid to the Cohoes Company the rent in arrears on said premises amounting to $4,850, and on October 15, 1917, the plaintiff caused to be served on the Cohoes Company the following notice:

" To THE COHOES COMPANY.
" *Cohoes, N. Y.:*

" GENTLEMEN.— *This is to notify you* that I have purchased from the Charles H. Adams' Estate, premises situate on the Northwest corner of Remsen and Factory streets, Cohoes, N. Y., together with all power rights appurtenant to said premises, and that I am prepared and ready to enter into a contract, with your Company, for electric power under your usual form of contract, known as the Knitting Mill Contract, for Fourteen and eighty-two one hundredths (14 82/100) mill power. Said electric power being substituted for the water power to which said premises are entitled, under leases and by usage from your Company.

" This notice is served to comply with the conditions set forth in the contract entered into between your Company and the said Charles H. Adams' Estate, dated October 16, 1916.

" CHARLES H. KAVANAUGH.
" Dated Cohoes N. Y.,                     by
" October 15, 1917.          FRANK W. NEARY
                                    *" Attorney in Fact."*

Supreme Court, March, 1921.        [Vol. 114.

The Cohoes Company declined to enter into a contract with the plaintiff for the supply of electric power the equivalent of fourteen and eighty-two one-hundredths mill-power and stated to him that the premises were entitled to but six mill-power.

I am unwilling to determine the issues between these parties upon the basis of the failure to have expressed in the deed that the conveyance was made upon the express condition that the rents in arrears should be paid by the grantee, and that such grantee should agree to enter into such an electrical contract. While the plaintiff did not expressly assume the contemplated obligations, the rents were in fact paid, and the plaintiff immediately made an offer to the only person interested with reference to the signing of an electrical contract. The real question is whether the offer then made meets the terms of the agreement between Adams' estate and the company.

The mutuality contemplated by the contract such as would be enforceable by the company was accomplished by the offer made so far as the electrical contract was concerned and if the plaintiff had made an offer to contract for six mill-power instead of the fourteen and eighty-two one-hundredths mill-power, it would seem clear to me that the defendant could be compelled to live up to an agreement implied from the whole tenor of its contract with the Adams' estate, but that question is not presented in as much as this is not an action to compel the making of such a contract for the equivalent of six mill-power. The defendant has never been requested to make any such contract and it has never declined to make such a contract.

It is the claim of the defendant that the Adams' estate failed to comply with the condition in its contract of October 16, 1916, with reference to an elec-

trical contract in the place of water-power for six mill-power and that the default of the Adams' estate in payment of rent was never waived and that the Cohoes Company was entitled to re-enter in and upon the demised property and repossess itself of the same. The defendant offered on the trial of this action to return or pay into court the rent paid by the said Adams October 13, 1917, with interest thereon to date of payment, and also the sum of $1,400 provided for by said contract with interest thereon.

It becomes clear from the foregoing statement of facts that on October 16, 1916, the date of the contract between the defendant company and the Adams' estate, such estate was in default in the payment of its rents and had been for three years, and that the company had the right at that time to re-enter and repossess itself of the property under the terms of the instruments of 1849 and 1866.

It is clear that being in default the said estate had no rights to assert either as to the water-powers expressly granted by the lease or as to any excess water-powers that might have accrued to it. It was the agreement of October 16, 1916, which revived any rights that the estate may have possessed prior to its default and so far as the estate and those holding under it are concerned, their rights must be fixed by the agreement itself, unless there has accrued to the plaintiff some additional right by way of estoppel which question will be considered later. The only object of considering whether the Adams' estate had ever been possessed of rights by prescription or estoppel, to additional water-powers beyond those expressly set forth in the instruments of 1849 and 1866, arises out of the fact that there is a contention between the parties here as to the quantity of water-power, if any, referred to in the agreement of October

16, 1916. In other words, as bearing upon the mutual intention in interpreting this contract, an important question arises as to whether the estate had ever had any right to this excess water-power.

The court will endeavor to give that consideration to a contract which is most equitable to both parties instead of a construction which will give one of them an unfair and unreasonable advantage over the other. *Fleischman* v. *Furgueson,* 223 N. Y. 235.

In determining whether the Adams' estate ever acquired any right by prescription to any water-powers in excess of those granted in the instruments of 1849 and 1866, it becomes necessary to consider the question of the relationship of the parties created under these instruments. Did they create the relationship of landlord and tenant? This appears to be important because it is fundamental that the tenant cannot set up adverse possession while the relationship of landlord and tenant continues. The tenant cannot dispute the title of his landlord. But when does this relationship exist? Does a conveyance with a reservation of rent create it? Has the constitutional provision abolishing feudal tenures and their incidents in any way affected this matter, or is the relationship a thing separate and apart from tenure as known at the common law? It is the claim of the plaintiff that the rule prohibiting a tenant from acquiring a title by adverse possession against his landlord has no relation in respect to a grantee of an estate of inheritance, where provision has been made for the payment of a perpetual rent with the right of the grantor to re-enter upon default in the payment thereof. It is the claim of the plaintiff that an estate of inheritance was created. It is the claim of the defendant on the other hand that the instrument of 1849 did not convey the fee of the demised premises,

but was at most a life estate during the life of the lessee. The provision in the instrument of 1849 which is important for our consideration is that the " parties of the first part for and in consideration of the yearly rents, covenants and conditions hereinafter contained on the part of the said party of the second part, his executors, administrators and assigns, to be paid, kept and performed, have demised, leased and to farm let unto the party of the second part, and to his executors, administrators and assigns, all that certain, piece or parcel of land, etc.  *    *    *

" *To have and to hold* the said parcel of land with the privileges and appurtenances unto the said party of the second part, his executors, administrators and assigns forever.  *    *    *

" *Yielding and paying* therefor, yearly and every year thereafter unto the said parties of the first part or their assigns, the yearly rent," etc.

Setting forth as the basis of such rent the rental value of a certain amount of water power described in the instrument and made appurtenant to the premises.

It was further covenanted and agreed that the Cohoes Company should have the right of re-entry in the case that the rents were not paid.

The words " demise, lease and to farm let " contained in this instrument are apt words of a lease. Watk. Conv. 207. Technically and in its proper significance the term " lease " refers to a deed of a less interest than the lessor has, for, as Blackstone says, if it is of the whole interest it is more properly an assignment than a lease. 2 Black. 317.

Also, a lease is usually and properly in consideration of a yearly rent, as is the instrument in question, and the proper language for reserving it is " yielding and paying therefor yearly " during the

Supreme Court, March, 1921.          [Vol. 114.

term, the rent in the amount named. An assignment, on the other hand, is properly the transfer of one's whole interest in any estate, but it is generally appropriate to the transfer of chattels either real or personal, or of equitable interests. Watk. Conv. 227; 2 Black. Comm. 326.

If the conveyance in question is in fee, it may, in want of a better term, be called a lease as it is in that form, though it is in the nature of an assignment.

The lease of 1849 runs to Egbert Egberts, his executors, administrators and assigns, forever. At common law this would convey but a life estate. The rule is stated by Littleton thus: " For if a man would purchase lands or tenements in fee simple, it behooveth him to have these words in his purchase, To have and to hold to him and to his heirs; for these words [his heirs] make the estate of inheritance. For if a man purchase lands by these words, To have and to hold to him forever; or by these words, To have and to hold to him and his assigns forever; in these two cases he will have but an estate for term of life, for they lack these words [his heirs], which words only make an estate of inheritance in all feoffments and grants." Littleton, § 1.

At the time the lease in question was made, however, our Revised Statutes provided that words of inheritance were not requisite to create or convey an estate in fee, and that every grant or devise of real estate, or any interest therein, shall pass all the estate or interest of the grantor or testator, unless the intention to pass a less estate or interest shall appear by express terms, or be necessarily implied in the terms of said grant; and the Revised Statutes further provided that in the construction of every instrument creating or conveying any interest or estate in land, it shall be the duty of the courts of justice to

carry into effect the covenant of the party so far as such covenant can be collected from the whole instrument and is consistent with the rules of law. R. S. pt. II, chap. 1, title V, §§ 1, 2. These sections have been substantially continued in the Real Property Law. Real Prop. Law, § 240.

The conveyance in question runs to Egbert Egberts, his executors, administrators and assigns. The habendum reads that Egberts is to have and to hold said piece or parcel of land unto himself, " his executors, administrators and assigns forever." These words, considered without reference to technical rules, are inconsistent with a mere life estate. An estate for life does not run to a person and to his executors and administrators. It can be measured only by a life, and it does not survive to executors or administrators of the person whose life measures the duration of the estate, and who is the owner of the estate. Moreover, the use of the word " forever " in the habendum is inconsistent with a mere life estate. Neither can the conveyance be considered a lease for a term of years, because there is no definite term set forth. It is essential to create a lease for years that the term be certain. It must have a certain beginning and a certain end. Co. Litt. 58. There must always be a time absolutely fixed, beyond which the estate cannot continue. There may be a term created for 99 years, " provided 'AB' live so long. Here, if 'AB' die before 99 years expire, the term shall cease, but, though 'AB' should survive the 99 years, the lease on the expiration of the 99 years would be absolutely at an end." Watk. Conv. 12.

Since words of inheritance are unnecessary to create a fee, the terms of the instrument are consistent with the existence of such an estate, and inconsistent with a lesser interest.

39

The estate created, however, is not in fee simple absolute, but by reason of the reservation of the rent and right of re-entry for non-payment, it is an estate upon condition. *Van Rensselaer* v. *Ball,* 19 N. Y. 100; 2 Black. Comm. 109.

Not only the terms of the instrument indicate that an estate in fee rather than a life estate was intended to be created, but the form, likewise, leads to this conclusion. The instrument is partly written and partly printed. The printed part was drawn by a skillful conveyancer in the form of a lease for years, with a blank in the habendum for the statement of the term. When this conveyance was drawn the parties used the printed form and in the habendum instead of inserting a term of years, inserted the word "forever." Undoubtedly, the intention of the parties was to create an estate in fee, and they used the printed form because it was conveniently at hand, adapting it as best they could to the agreement of the parties.

Having reached this conclusion, we are next confronted with the vexing question whether a conveyance in fee reserving to the grantor and its successors and assigns a perpetual rent with a right of re-entry on default of payment, creates the relationship of landlord and tenant so as to estop the plaintiff from asserting any rights by prescription.

At the present time the relationship described by the words "landlord and tenant" is ordinarily understood to mean that existing between a lessor and lessee in reference to an estate for years. When we use these words in reference to an estate of inheritance, we have difficulty if we attempt to obtain any insight into the rules applicable thereto, from precedents in our courts. And because of our unfamiliarity with the English system of landholding except in a desultory historical way, we are bound to be somewhat

laborious, when we attempt to trace old rules and apply them to modern conditions. Especially is this true of the relation of landlord and tenant, which title comprehends that of lord and tenant, terms no longer in general use.

The decay of the relation of lord and tenant and the blending of it in that of landlord and tenant has been so gradual that there is no telling where the latter began. The ancient rules which, in the course of time, have now become more or less obsolete, have been slowly adapted to changed conditions of land tenure and extended by legislative enactment, until we have a system of land law entirely different from the early original. The contrast between the old and the new is striking. A line of demarkation cannot be found, although there have been some abrupt and revolutionary changes. Thus, under the feudal system where a mesne lord made a feoffment in fee to hold to the feoffee and his heirs rendering a rent or performing services, the relation of lord and tenant was constituted between the parties, the tenant holding of the lord and thus by tenure. The idea that there must be a tenure to constitute the relation of lord and tenant or landlord and tenant persisted and continued after the statute of *Quia Emptores* which put an end to promiscuous subinfeudation. Thereafter, a new tenure could not be created upon a conveyance in fee (except in case of the king, etc., not necessary to notice, *People* v. *Van Rensselaer,* 9 N. Y. 330); but upon the conveyance of a lesser estate by the tenant in fee, a tenure, though imperfect, would arise as an incident to the reversion. Thus a reversion was necessary to create a tenure, and tenure was necessary to constitute the relation of landlord and tenant.

The reasons for these rules, I will proceed to discuss.

By the law of England, there is a fundamental maxim or fiction (Wright Ten. 58) that all lands and tenements are holden mediately or immediately of the king. Co. Litt. 1a.  The thing holden is styled a tenement, the possessor, a tenant, and the manner in which it is held, the tenure. 2 Black. Comm. 59.  Tenure has been the backbone of the English system of landholding; it always implies the relation of lord and tenant or landlord and tenant.  All lands in England in the hands of a subject necessarily are held of some superior lord (Co. Litt. 1b), if not of a mesne lord, then of the king as lord paramount.  It was by implication of this theory that the king, after the conquest, granted, regranted, or in effect at least confirmed to the chief men of the kingdom large parcels or tracts of land called feoda in return for services.  According to the custom of the times these chief tenants, if they had not already done so, in turn, granted to others, portions of their lands to hold of them by the performance of services, and thus the process of subinfeudation was continued to the lowest tenant who cultivated the land and gathered the crops.  The lowest or tenant paravail performed his service to the next superior in order.  Wright Ten. chap. II; Digby's Hist. Law of Real Prop. (5th ed.) 37; 1 Pollock & Maitlondi Hist. Eng. Law, 232–240; 2 Black. Comm. 45, 59; Comyn Lord & Ten. Int.; Burton Real Prop. 316; Gilbert Rents, 1; Watkins Ten. XIII; Bell Land. & Ten. 6–10; 1 Reeves Hist. Eng. Law (Finlason), 238.

In this manner was the relation of lord and tenant created.  There may have been a long train of subordinate lords between the king and the actual tenant of the land.  The duties owing by each tenant to his superior constituted the tenure of the land, and the corresponding right in each superior was called the seignory.  Burton Real Prop. 316.  Where the tenant

paravail was a tenant in fee, the tenure was perfect and constituted a substantive and independent seignory. The seignory somewhat resembled a reversion as this term is used in the law of estates. Burton Real Prop. chap. VI. Thus, as one of the fruits of a seignory is escheat, which signifies properly when by accident the lands fall to the lord of whom they are held, as by the tenant's failure of heirs or attainder of treason, it resembled a reversion. 2 Britton, chap. VI; Co. Litt. 13a.

Indeed, an escheat has been called a reversion, though improperly. Digby Real Prop. (5th ed.) 226, n. 1. A reversion proper arose when a tenant in fee simple made a gift in tail, or a lease for life or years. Lord Coke in his commentaries on Littleton gives other examples but in the last analysis it appears that in these there is always a remnant of the fee left in the grantor, however complicated the limitation. Co. Litt. 22b.

In the year 1290 the custom of subinfeudation had become intolerable, whereupon the statute *Quia Emptores* was enacted. 18 Edw. chap. 1.

Thereafter no new tenure could be created on a feoffment in fee simple, unless by the king or a tenant *in capite* (which it is not here necessary to notice) because by the force of the statute, all lands and tenements so granted were held of the chief lord of the same fee by such services and customs as the feoffor held before. Burton Real Prop. 317; 2 Black. Comm. 91.

The effect of this statute was to prevent subinfeudation, and to permit alienation of lands in fee, free and clear of any new tenure.

Before the statute of *Quia Emptores* if a man made feoffment in fee simple, yielding to him a certain rent, this was a rent service and a tenure was created

between the parties. The relation of landlord and tenant was thereby created and as an incident thereto the landlord by reason of the relationship might distrain as of common right. So too where a feoffment in fee was made before the statute and there was no reservation of any rent or service yet the feoffee held of the feoffor by the same service as the feoffor did hold over of his next lord paramount. In such a case a tenure was created and the relationship of landlord and tenant came into existence, for the feoffee held of the feoffor and not of the lord next paramount to the feoffor. After the statute this would not be a fact. When the feoffor parted with his fee the relationship of landlord and tenant did not spring up as between the feoffor and feoffee but the lands were held by the feoffee under the old tenure, that is of the landlord of whom his donor held.

From this it is observed that after the statute of *Quia Emptores* where there was a conveyance in fee reserving a rent without a clause of distress in the deed, the rent was a rent seck, that is to say, a barren rent, because, as there was no reversion the relationship of landlord and tenant did not exist, and, therefore, the feoffee could not distrain as of common right.

Where, however, a clause of distress was inserted in the deed the rent was a rent charge and the feoffee would have the right to distrain, not because the relationship of landlord and tenant existed between the parties, but simply by reason of the clause in the deed. The right to distrain in such a case arose by means of the agreement or convention of the parties and not by reason of the relationship which arose under the deed. The binding tie between the landlord and the tenant was fealty which was inseparably incident to the reversion. In the case of feoffment in fee reserv-

ing a rent after the statute, fealty did not exist between the immediate parties to the deed as there was no reversion. This is explained at length in the sections relating to rents in Coke upon Littleton.

By the statute 4 Anne, chapter 16, the necessity for attornment was done away with and by the statute 12 Car. 11, chapter 24, military tenures were converted into free and common socage. Successive alienations of fees gradually weakened the tie between lord and tenant and the relation generally became obliterated except in existing manors. Digby Real Prop. (5th ed.) 235. The relation of landlord and tenant however, especially in cases of estates for years, became a developing institution, as is evidenced by the Landlord and Tenant Acts beginning in 1709. Although fealty became a mere fiction and tenure little more than a theory as its burdensome incidents were swept away, it appears to me beyond question that English lawyers at the time of American independence had no other notion than that a reversion was necessary to constitute the relation of landlord and tenant, and I so understand the holding in *Pluck* v. *Digges,* 2 Dow & C. 180.

By the first Constitution of the state such parts of the common law of England and of Great Britain and of the acts of the Colonial legislature as together formed the law of the colony at the breaking out of the Revolution were declared to be the law of this state, subject to alteration by the legislature. Art. 35. The statute of *Quia Emptores* and other acts contained in the compilation of Jones & Varick were re-enacted by the legislature so that our statutory record would be as complete as possible. The effect simply was to continue on our own statute book, statutes which had always been the law of the colony. *Van Rensselaer* v. *Hays,* 19 N. Y. 68. Practically, there-

fore, the law of landlord and tenant was imported from England in substantially the condition in which it existed in that country at the breaking out of the Revolution. Its applicability, of course, was sometimes a question owing to the different conditions in a new and unsettled country.

However, in this section of the state, both before and after independence, it was customary for the Van Rensselaers to convey farms in fee reserving a rent either in money or in kind, with a right of re-entry and distress. These perpetual leases, as they were called, came before the courts in a number of cases and were declared effectual. *People* v. *Van Rensselaer,* 9 N. Y. 334; *DePeyster* v. *Michael,* 6 id. 467; *Devisees of Van Rensselaer* v. *Executor of Platner,* 2 Johns. Cas. 26; *Watts* v. *Coffin,* 11 Johns. 495; *Van Rensselaer* v. *Bradley,* 3 Den. 135; *Van Rensselaer* v. *Jones,* 5 id. 449; *Jackson* v. *Collins,* 11 Johns. 1; *Van Rensselaer* v. *Jewett,* 5 Den. 121; *Van Rensselaer* v. *Hays,* id. 477; *Van Rensselaer* v. *Snyder,* 13 N. Y. 299; *Main* v. *Feathers,* 21 Barb. 646; *Van Rensselaer* v. *Bonesteel,* 24 id. 356; *Van Rensselaer* v. *Gallup,* 5 Den. 454; *Van Rensselaer* v. *Roberts,* id. 470.

The system of perpetual leases and rents developed bitter controversies which culminated in the anti-rent wars in this vicinity. These were finally settled by the decision of the Court of Appeals in *Van Rensselaer* v. *Hays,* 19 N. Y. 68, and a few later decisions on the same subject.

It is not clear whether the Court of Appeals in the early cases intended to decide that the relation of landlord and tenant was created by a perpetual lease.

In *Van Rensselaer* v. *Hays,* 19 N. Y. 68, it was held that the defendant as assignee of the grantee of land held under a lease in fee subject to a rent charge, was liable to the plaintiff who was the representative of

the grantor for the rent accruing after the assignment. The court based its holding on chapter 98 of the Laws of 1805 which enabled the grantees of reversions to take advantage of the condition to be performed by the lessees and which also provided that it applied to grants or leases in fee reserving rents as well as to leases for life or years.

Anson Bingham, counsel for the appellant, contended that a reversion was necessary to constitute the relation of landlord and tenant and later in his treatise on the Law of Real Property, he discusses this question at length. His comments are interesting as a matter of history as they show the confusion which existed in relation to this subject.

Mr. Bingham says that in a more recent case, *Van Rensselaer* v. *Read,* 26 N. Y. 563, the same court declared it to be a settled proposition that, since the passing of the act of 1787, concerning tenures, it has not been possible to create any new tenures in this state upon conveyances in fee. See, also, *Van Rensselaer* v. *Dennison,* 35 N. Y. 393.

It must, therefore, be regarded as the settled law of the state that a feudal lord, in other words, the lord of an estate in fee, does not exist in the state, except as that position is represented by the state in its sovereign capacity. It may indeed be truly remarked, that no other point of the law has ever been, in so short a time, so often, so expressly, so uniformly and so decisively pronounced by any one court as that point has been. Each successive decision, from *DePeyster* v. *Michael,* in 1852, down to *Van Rensselaer* v. *Dennison,* in 1866, has been more emphatic than its immediate predecessor. The case last named has left that point so expressly and so fully pronounced, that no other decision can ever make it more distinct and emphatic.

But what makes the decisions referred to particularly worthy of comment, is the fact that, excepting the case first named, while they have pronounced the law in favor of one party, they have pronounced the judgment of the court in favor of the other party. In the *DePeyster* case, they conformed the judgment to the law as they pronounced it. In the other cases, they decide the law one way and give judgment the other.

In *Van Rensselaer* v. *Read,* 26 N. Y. 558, it was held that the assignee of such a rent might maintain an action on the covenant at common law, irrespective of the statute of 1805. In the course of the opinion in this case it is intimated that the relation of landlord and tenant is created between the parties to a lease in fee reserving a rent.

In *Hosford* v. *Ballard,* 39 N. Y. 147, it appeared that the plaintiff brought an action of ejectment to recover possession of lands held by the defendant under grant in fee reserving rent. The court held first that the title of the plaintiff was sufficiently shown, and second that the plaintiff was entitled to recover without a demand of the rent. On the second question it was argued before the court that the provisions of 2 Revised Statutes, part III, chapter 8, title 9, article 2, section 1, which dispensed with the necessity of the demand, did not apply, for the reason that the plaintiff was not a landlord and defendant was not a tenant.

The court said: " This is an erroneous restriction of the meaning of the terms ' landlord and tenant.' One who holds lands by any kind of title, whether for years, for life, or in fee, is tenant, and he of whom land is held subject to the rendering or payment of rent or service is landlord. The cases which hold that since the act of 1787 concerning tenures no feudal ten-

ure can be created in this State do not require that a statute so highly remedial should be restricted in its application to leases for a term or for life, when every evil it was intended to remedy called for its application wherever rent was reserved and the right of distress and of re-entry existed.''

In *Van Rensselaer* v. *Dennison,* 35 N. Y. 393, the court held that conveyance in fee reserving a rent operated as an assignment and not as a lease, and that it left neither any reversion or possibility of reverter in the grantor and that since 1787 it has not been possible to create a feudal tenure in this state and consequently none of the peculiar incidents of that tenure attached to an estate granted by one citizen to another.

In *Cruger* v. *McLaury,* 41 N. Y. 219, which was an action of ejectment to recover possession of an undivided one-sixth part of a lot held under a lease in fee, reserving a rent with a condition of re-entry in case of non-payment, the plaintiff claimed that she was one of six children, the heirs of the owner of the rent charge. The court held that she might recover her undivided one-sixth part of the premises leased. It is not perfectly clear upon just what grounds the court arrived at its conclusion, but a careful reading of the opinion seems to indicate that the court assumed that the relation of landlord and tenant existed between the parties and invoked the rule that by the demise of the landlord, leaving several heirs, the rent becomes severed and each heir might maintain an action upon the covenant to recover a portion of the rent due him.

In *Saunders* v. *Hanes,* 44 N. Y. 353, question arose as to the title to a mill seat situate on a certain river. The majority of the court held that the indenture conveyed a fee with reservation of the rent. Judge Gray

concurred in the result but placed his holding upon other grounds than those announced by the majority of the court. He held that the indenture in question conveyed a life estate to the grantee subject to the payment of rent and that the heirs of the grantee who continued to hold the mill seat and pay the rent established a claim of adverse possession. He also held that the rule that the relation of landlord and tenant establishes an allegiance by the tenant to his landlord, and prohibits the tenant from denying his landlord's title, did not conflict with the right of the defendant to interpose the defense of his adverse possession. He based this ruling upon the fact that the original entry was for the life of the grantee subject to the rent and that after his death the defendant and those under whom he claimed for a space of over fifty years, claimed an absolute title to the mill seat, subject to the precise allegiance under which the life tenant entered and that as the defendant or those under whom he claimed continued to hold the property under the same terms as the life tenant and the plaintiffs had acquiesced in it and received the rent, it justified the presumption that the character of the title had been changed to accord with what one claimed and the other by lapse of time had conceded.

In *Central Bank of Troy* v. *Heydorn,* 48 N. Y. 260, it appeared that the plaintiff commenced an action to recover rent for certain premises under conveyance in fee, reserving a rent charge. It was held that, notwithstanding the strict relation of landlord and tenant did not exist between the parties, the assignee of the rent was entitled to recover the rent due and unpaid for the twenty years preceding the action as the covenant sued upon remained in the possession of the plaintiff uncancelled and was produced and read in evidence; that while the law presumed payment prior

to the twenty years there was no presumption even upon proof of non-payment of the rent for the period of sixty-three years before the commencement of the action that the rents had been extinguished and the covenant released.

To the same effect was the holding in the case of *Lyon* v. *Odell,* 65 N. Y. 28. In this case the court assumed that the relation of landlord and tenant existed between the parties.

*Bradt* v. *Church,* 110 N. Y. 537, was an action of ejectment. It appeared that lands were covered by a Van Rensselaer lease made in 1794; that defendant Church succeeded to the interest of the lessor and in 1881 obtained possession under a judgment in an action of ejectment brought under a right reserved in the lease to re-enter for non-payment of rent against one in possession as tenant of Bradt, the plaintiff. Bradt, the plaintiff, was not a party to the former action of ejectment. It was held that while the judgment in the former action was not conclusive upon Bradt, the plaintiff, who was not a party to that action as to the averments in the complain therein, yet it was against the person then in actual occupation and that the defendant Church's entry thereunder was lawful, and enabled him to defend his title and possession against the plaintiff's claim. The plaintiff, Bradt, claimed title under a deed of release and quit-claim made in 1863, with prior possession in the grantors from 1850. No proof was given as to the sources of the title of said grantors. It was held that in the absence of proof to the contrary the occupation of plaintiff's grantors was controlled by the presumption that when the relation of landlord and tenant is once established it attaches to all who may succeed to the possession under the tenant; that plaintiff's deed did not necessarily imply a title hostile to that of the land-

lord and that, therefore, he failed to show title superior to that of the defendant.

This case appears to be a direct and positive authority for the proposition that for the purpose of determination of the existence of adverse possession, the relationship of the parties to the perpetual lease is considered to be that of landlord and tenant. It is difficult to see how this decision can be sustained on any other theory.

*Church* v. *Shultes,* 4 App. Div. 378, was an action of ejectment brought in this county. It appeared that the land in question had been leased by a perpetual lease subject to the payment of a rent charge. It was held that the relation of landlord and tenant existed between the parties to the lease and their successors in title, and that the provisions of section 373 of the Code of Civil Procedure applied in determining the question of adverse possession.

It thus appears that the authorities on the subject in this country seem to lack support in the old common law, and it is not surpising that confusion should have arisen in the mind of Mr. Bingham leading him to make the statement which I have quoted above, to the effect that while the courts had pronounced the law in favor of one party, they had pronounced the judgment of the court in favor of the other party.

In the light of the cases decided subsequent to *Van Rensselaer* v. *Hays, supra,* however, this seeming incongruity disappears. Consider for instance the opinion of Judge Gray in *Central Bank of Troy* v. *Heydorn, supra.* He states that the strict relation of landlord and tenant does not exist between the parties to a perpetual lease. In *Lyon* v. *Odell, supra,* the court says that where the relation of landlord and tenant is once established under a sealed lease the mere circumstance that the landlord has not demanded

the rent cannot justify the presumption that he has extinguished his right by a conveyance to the tenant, citing with approval *Central Bank of Troy* v. *Heydorn.* These statements are not inconsistent. On the one hand the strict relation of landlord and tenant, that is to say, the relation of landlord and tenant arising by operation of law as a result of feudal tenure, is not created by such a conveyance but, on the other hand, as a matter of agreement between the parties to the sealed lease the conventional relation of landlord and tenant is constituted. Indeed, in this day and age under our system of tenure, it is difficult to see how the relation of landlord and tenant can be other than a mere conventional one.

In 1787, the legislature declared what had already been the law of the colony that all tenures were turned into free and common socqge and all the feudal incidents thereto, except rents certain, fealty and distresses, were abolished. It was also declared that all grants theretofore or thereafter made by the people of the state should be allodial and not feudal. Act of Feb. 20, 1787. The latter provision was new. In 1830 the Revised Statutes were enacted whereby feudal tenures and all their incidents were abolished, saving all rents and services certain. All grants were thereafter declared to be allodial. The abolition of feudal tenures and their incidents effectually put an end to the strict relation of landlord and tenant which could only arise in connection with some feudal tenure. Thereafter by convention of the parties a relationship could be constituted resembling in many essential particulars that existing under a feudal tenure, which we, in these times, invariably refer to as the conventional relation of landlord and tenant. Fundamentally, the contrast between the strict relation and the conventional relation is sharp. The change from the

Supreme Court, March, 1921. [Vol. 114.

one to the other, however, has come about so gradually and so naturally that it is confusing to attempt to trace it.

It seems to me that the Court of Appeals in the cases which I have reviewed has consistently adhered to the distinction which I have indicated, although the court does not seem to have announced it in so many words. It was the failure of Mr. Bingham to note the distinction which lead him to assert that the Court of Appeals in the *Van Rensselaer* cases held the law in favor of one party but gave judgment in favor of the other. He overlooked the fact that the court was dealing with a conventional relation and not with the feudal relation of landlord and tenant which, of course, he could not conceive where there was no reversion in the grantor under the lease.

I have thus reached the conclusion that the instruments of 1849 and 1866 constituted the conventional relationship of landlord and tenant, notwithstanding the fact that at the common law there was no such thing as a perpetual lease; and I have determined that even though the rights of the tenant were almost as extensive as those of an owner, nevertheless, the obligations with reference to the water-power were always dormant.

The plaintiff here may contend that the additional water-power, which he claims, is not included within the terms of the lease, but in addition thereto, and, therefore, the relation created under the lease could not affect in any way his rights in the additional water-power. It is undoubtedly true that a tenant of one piece of land may acquire title by adverse possession against his landlord as to another piece of unrelated land. Where, however, additional land is acquired by the tenant for the more profitable enjoyment of the demised premises and physically con-

nected therewith, the rule would be otherwise. The same principle should apply to an easement. *Bedlow* v. *New York Floating Dry Dock Co.,* 112 N. Y. 262, 283. The use by any of the company's lessees of water-power in excess of the quantity specified in its lease under the facts in this case could never give rise to a prescriptive right.

Moreover, assuming that a prescriptive right might arise, I am not convinced by the proofs that the use of excess water in this case was ever open, notorious or adverse. The water was carried to the premises of the user in a penstock under ground and passed through no measuring device. The flow of water through a penstock of a lessee in excess of the quantity provided for in his lease was not necessarily detrimental to the interests of the company, in that such flow served to maintain the required level in the next lower canal and such flow would have to be provided by the company through its spillways had it not passed through the penstock of the lessee. Hence, the use was not adverse or detrimental to the company. The proof fails to show that the company had knowledge or ought to have known the quantity being used. It was obliged to rely upon the integrity of the user, that he would observe the covenants of the lease not to use more than provided for therein except as the company might have determined the quantity being used through a scientific device or computation requiring technical knowledge for the determination. There is no evidence that the company had any knowledge of the quantity of water being used until the measurement of 1910. Mr. Adams who had been in charge of the premises since 1886 testified that he never knew the quantity of water that was being used until notified of the results of this measurement of 1910, and never knew that he was using prior to that time any

quantity in excess of the quantity specified in the leases. He testified that he never claimed a right to use water-power in excess of that quantity.

The case of *Union Bag & Paper Co.* v. *Allen Brothers' Co.,* 107 App. Div. 529, cited by the plaintiff, is not applicable to this case. That was a case where there was a written agreement between the parties which was ambiguous in reference to the amount of water each was entitled to and the court received evidence of the practical construction of the agreement put upon it by the parties by their operation under it for a series of years and construed it in the light of such practical construction.

In taking up for discussion the rights which existed under these ancient grants, together with the history of the relations between the defendant company and Adams, I have given the plaintiff the benefit of the doubt as to whether the written agreement of October 16, 1916, might be in fact ambiguous in reference to the amount of water to which these premises were entitled. But even if we construed the language of the contract of October 16, 1916, as merely descriptive of the kind of power to be displaced instead of stating the limits as well, what foundation is there for the plantiff to claim the additional eight and eighty-two one-hundredths mill-power, if Adams never had a right to it, never claimed it, never paid for it, and did have it offered to him in electrical equivalent in the proposed contract for electrical power, which he received shortly prior to making the agreement of October 16, 1916? Under such circumstances there should be no implication that it was the intention of the parties to include it. On the contrary the situation which had existed between those parties would justify the conclusion that an intent to include the additional eight and eighty-two one-hundredths mill-

power should have been clearly expressed in order to warrant such an interpretation.

My consideration of the history of the relations between the defendant company and Adams and their predecessors in title, leads me to the conclusion that the only fair interpretation of the contract of October 16, 1916, is that it was intended to limit the mill-power to six mill-power.

Having reached that conclusion I fail to see how estoppel or prescription has anything to do with the case. What the Cohoes Company did and said before making that contract was merged in it. I have considered such evidence, however, only for the purpose of interpreting its provisions upon the theory of a possible ambiguity. I have reached the conclusion that there is no ambiguity to be resolved against the company. If Adams had never had a right to such additional power, nor even a right to expect it by virtue of any compromising act or word of the company, any presumption that might have favored him and his assignee in the interpretation of the contract, due to the fact that it was drawn by the company's president, would not arise. The agreement was not a harsh one, but a just if not a generous proposal and one entitled to be construed in accordance with its plain terms rather than enlarged by implication.

If the contract of October, 1916, had not been made surely plaintiff would not have a cause of action for any of the relief demanded in his complaint, for without that contract there was no obligation on the defendant to make an electrical contract as to these premises. If the plaintiff did not see the contract, he cannot shield himself behind the refusal of Adams to show it to him. He assumed the risk and took his chances as to its wording. He could have taken up the matter with the company before it was too late.

He knew that a contract had been made. The proof shows that since the fire in 1913, the premises enjoyed no power of any kind and the Cohoes Company had constructed a permanent concrete wall shutting off the water from the premises, both of which should have put the plaintiff upon inquiry as to what power rights, if any, the premises continued to enjoy. Mr. Adams says the plaintiff did call him on the telephone, that he had agreed to purchase the premises and said that he thought there were fourteen mill-power when he offered to buy, because he had seen some memorandum on some other lease. Mr. Adams says he told him he did not know anything about that and that the plaintiff said: " If there is only six, why we will call the sale off," and Adams said: "All right." Adams said to the plaintiff at the time of the final closing of the transaction with the plaintiff that he would only guarantee six mill-power but if there was any more than that the plaintiff was certainly entitled to it as he was selling the plaintiff everything the Adams' estate had. Adams says: " I repeated a number of times that all I could guarantee was six." This testimony of Adams is uncontradicted.

The plaintiff also talked with Mr. Wertime in reference to the mill-power and Mr. Wertime swears that he told plaintiff that Mr. Adams had made an agreement with the company by which the premises were limited to six mill-power. The testimony of Mr. Wertime is not directly contradicted. The plaintiff simply says that Wertime told him that if plaintiff would sell Wertime the land he would be sure to get the plaintiff the fourteen and eighty-two one-hundredths mill-power.

It is not claimed that the plaintiff ever saw any recital as to the number of mill-power connected with these premises except in the schedule attached to the so-called Benson contract, of which the plaintiff took

an assignment and in the proposed electrical contract relating to the premises in question, which the plaintiff received from Adams at the time of his purchase. The contract had been submitted to Adams by the company but he had not signed it. In that contract it was plainly shown that the electric current to be furnished was the equivalent of six mill-power and the rental to be paid was $1,200. The plaintiff says: "I just saw the front page of it and it said 14.82 mill power." The plaintiff knew that the rate was $200 per mill-power. He admits knowing that $1,200 would not represent the fourteen and eighty-two one-hundredths mill-power because he already was paying on another lease at the rate of $200 per mill-power. He had heard that the Adams' estate had never paid more than $1,200.

The proposed electrical contract handed to him by Adams, in the same paragraph where it mentioned the figure fourteen and eighty-two one-hundredths contained the statement that the additional water-power to the amount of eight and eighty-two one-hundredths mill-power was to be at an additional yearly rental of " $ .00."

The plaintiff had no right to rely upon any declaration in the schedule, nor the figure 14.82 on the front page which was inconsistent with the plain terms of the contract as a whole, which he could have discovered if he had exercised any care in reading it.

Moreover, the schedule of proposed indentured grantees was prepared for a certain and definite purpose as set forth in the contracts to which it was attached. It is a statement concerning persons who may secure rights in the future for electricity which must be secured by March 13, 1917. One who failed to sign before that date would not be an indentured grantee entitled to the water-power set forth in the schedule. If he failed to sign by that date, the fact that

his name might continue to be upon the schedule was thereafter of no value to him whatsoever. No electrical contract was signed for the Adams' premises within the date specified and thus the schedule became ineffective for any purpose in respect to these premises. This was a fact with knowledge of which the plaintiff was charged because it was plainly stated in both the Benson contract and the contract handed to him by Mr. Adams. The company cannot be bound by any admission beyond the conditions for which the admission was expressly made.

The proposed electrical contract for the premises in question was not capable of the construction placed upon it by the plaintiff and his failure to carefully read it ought not to accrue to his advantage by way of estoppel against the company.

So we get back to the plain terms of the agreement of October 16, 1916, which I have already interpreted. If that agreement was for six mill-power how can the company by estoppel be compelled to give the plaintiff the benefit of it, even if sufficient facts had been proved to justify the conclusion that the company had made a misrepresentation with full knowledge of the fact contained in such contract of October, 1916, and that the plaintiff in ignorance of the facts had acted upon such misrepresentation?

The company and Adams had a right to adjust their affairs so as to provide for the payment of the back rent and the execution of the electrical contract by entering into the agreement of October, 1916. When that contract was executed, the rights of the parties were merged in it and the parties were bound according to its plain terms. The rights of Adams did not suffer any violence when interpreted in accordance with such plain terms. The plaintiff was bound by it as the assignee of Adams and the hands of the com-

pany were as effectually tied as were those of Adams and the plaintiff. Any extension of the terms by the company thereafter directly or by estoppel would constitute a gratuity and a gratuity would not sustain the company in granting a rate at less than those fixed by the schedules filed by it with the public service commission. The case might be different if there was an ambiguity in the contract which was resolved against the company by the court. But there is no such ambiguity here, as I have held.

All of the above considerations must lead to the conclusion that the plaintiff's complaint should be dismissed. It remains only to consider the counterclaim of the defendant and the relief therein sought.

On the 13th day of October, 1917, Adams paid the rent with the statement that he had disposed of his interests in the property to the plaintiff. The Cohoes Company in accepting that rent had the right to assume that the Adams estate had complied with the condition in the agreement of October, 1916, as to the making of an electrical contract. The Cohoes Company accepted the rent upon that implied representation. There was no consideration for the agreement, except the mutual promises. The Adams estate having failed to pay the rent for three years prior to the execution of the agreement there was the absolute right of re-entry under the terms of the instruments of 1849 and 1866 and under the authorities which have been reviewed by me. The Cohoes Company only agreed that it should not exercise that right for one year, upon certain conditions, failure to perform which permitted the Cohoes Company to demand a surrender and cancellation of the two indentures of lease, upon paying the sum of $1,400 and upon the waiver of all rents in arrears, to the Adams estate. The Adams estate failed to comply with their condition. There was no assumption of the obligation of this agreement in the

transfer by the Adams estate to the plaintiff, and the plaintiff never did agree, either with Adams or the Cohoes Company, to sign a contract for the substitution of electric power for the six mill-power contained in the two indentures of lease recited in the agreement. The conditions, therefore, upon which the Cohoes Company agreed to waive the default in the payment of rent and to accept the purchase by the plaintiff of the interest of the Adams estate in the property, were not complied with, directly or indirectly. The waiver never was complete. The right of re-entry was to be waived and released only upon the terms stated in the agreement and as these terms were not complied with, the right of re-entry was never waived or released. Such right of re-entry existed on October 16, 1916, and has continued ever since and now exists because the condition upon which the company was to waive its right has never been complied with and it is now too late to comply with it and it was too late after October 16, 1917.

On the trial the defendant offered to pay into court the rent paid to it by Mr. Adams on October 13, 1917, and also the $1,400 provided for in the agreement, with interest on both sums.

Under section 1504 of the Code of Civil Procedure the defendant under the facts established here could maintain an action against the plaintiff when this action was brought, and under its counterclaim in this action it is entitled to judgment, cancelling and annulling the leases according to the terms and conditions of the October, 1916, agreement and restoring it to the possession of the demised premises.

The defendant is entitled to judgment dismissing the complaint and for affirmative judgment on its counterclaim in accordance with this decision, together with costs.

Judgment accordingly.